IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HUDGINS, et al., | ) | |
| | ) | Case No. 1:16-cv-07331 |
| Plaintiffs, | ) | |
| | ) | Judge Matthew F. Kennelly |
| -v- | ) | |
| | ) | |
| TOTAL QUALITY LOGISTICS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DECERTIFY</u>**

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

FACTUAL BACKGROUND .......................................................................................4

    A.    Overview of TQL ...................................................................................4

    B.    The LAE Job ...........................................................................................4

        1.    General overview of LAE duties.................................................4

        2.    LAEs act as transportation advisors to their customers. .....................10

        3.    Some LAEs perform additional management duties for TQL. ...........12

        4.    LAE compensation..........................................................13

    C.    LAET Training........................................................................13

    D.    The Members of the FLSA Collective ................................................15

STANDARD OF REVIEW ........................................................................................15

ARGUMENT ..............................................................................................................16

    A.    The Administrative Exemption Under the FLSA ............................16

        1.    Overview ......................................................................16

        2.    Courts have applied the administrative exemption to employees who perform similar job duties to LAEs and LAETs.................................18

    B.    The LAE Subclass Should Be Decertified........................................20

        1.    The specific duties that individual LAEs actually performed varied widely across the members of the collective. ........................................20

        2.    These differences materially impact the applicability of the administrative exemption........................................................23

        3.    Certain LAEs face additional, unique defenses. ....................................25

    C.    The LAET Subclass Should Be Decertified .......................................26

        1.    The actual duties and responsibilities that LAETs performed varied among the members of the collective. .....................................26

2.      The differences in duties performed by LAETs materially impact the applicability of the administrative exemption.........................................29

D.      Significant Differences in the Hours that the Collective Members Actually Worked Further Requires Decertification of the LAE and LAET Subclasses...............................................................................................30

1.      Legal Standard ...................................................................................30

2.      The actual hours worked by individual LAEs and LAETs widely varies. .............................................................................................................31

3.      Because of the extreme differences in hours worked per week, representative conclusions about the amount of overtime worked by any individual member of the collective cannot be reasonably drawn. ...................................................................................................33

E.      Proceeding as a Collective Would Be Unmanageable and Would Not Provide Any Fairness or Procedural Benefits ....................................................34

CONCLUSION ...........................................................................................................35

# **TABLE OF AUTHORITIES**

**Cases**

*Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2013 U.S. Dist. LEXIS 176496 (N.D. Ill. Dec. 17, 2013) ................................................................................................................................35

*Blanchar v. Std. Ins. Co.*, 736 F.3d 753 (7th Cir. 2013) .................................................. 18, 24-25

*Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339 (N.D. Ill. 2012) .........................16

*Cooney v. City of Chicago*, 644 F. Supp. 2d 1061 (N.D. Ill. 2009) ...............................................25

*D'Angelo v. J&F Steel Corp.*, No. 01-cv-6642, 2003 U.S. Dist. LEXIS 6273 (N.D. Ill. Apr. 14, 2003) ........................................................................................................................... 18-19, 24

*Dailey v. Groupon, Inc.*, No. 11 C 05685, 2014 U.S. Dist. LEXIS 119190 (N.D. Ill. Aug. 27, 2014) ........................................................................................................................... 30-31

*Demos v. City of Indianapolis*, 302 F.3d 698 (7th Cir. 2002)...............................................17, 23

*DeWalt v. Greencroft Goshen, Inc.*, 902 F. Supp. 2d 1127 (N.D. Ind. 2012) ..............................17

*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013).......................................30, 35

*Farmer v. DirectSat USA, LLC,* No. 08 CV 3962, 2013 U.S. Dist. LEXIS 79825 (N.D. Ill. June 6, 2013) ...............................................................................................................................31

*Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101 (N.D. Ill. 2013) ...................................... 16, 34-35

*Jacks v. DirectSat USA, LLC*, No. 10-cv-1707, 2015 U.S. Dist. LEXIS 28881 (N.D. Ill. Mar. 10, 2015) ...............................................................................................................................31

*Perine v. ABF Freight Sys., Inc.*, 457 F. Supp. 2d 1004 (C.D. Cal. 2006) ........................ 18-19, 24

*Piscione v. Ernst & Young, LLP*, 171 F.3d 527 (7th Cir. 1999)..............................................24-25

*Puentes v. Siboney Contracting Co.*, No. 11-80964, 2012 U.S. Dist. LEXIS 150727 (S.D. Fla. Oct. 19, 2012) ...................................................................................................................... 18-19, 24

*Russell v. Ill. Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804 (N.D. Ill. 2010)............................ 15-16, 35

*Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930 (N.D. Ill. 2008).......................................... 15-16

*Solsol v. Scrub, Inc.*, No. 13 CV 7652, 2017 U.S. Dist. LEXIS 80801 (N.D. Ill. May 23, 2017).31

*Verkuilen v. MediaBank, LLC*, 646 F.3d 979 (7th Cir. 2011)........................................................17

*Wade v. Werner Trucking Co.*, No. 2:10-cv-270, 2014 U.S. Dist. LEXIS 35653 (S.D. Ohio Mar. 18, 2014) ........................................................................................................ 18-20, 24

**Statutes and Regulations**

29 C.F.R. § 541.200(a) .................................................................................... 16-17

29 C.F.R. § 541.201(a) ........................................................................................ 17

29 C.F.R. § 541.201(b) .................................................................................. 17, 23-24

29 C.F.R. § 541.201(c) ................................................................................... 17, 23-24

29 C.F.R. § 541.202(c) ........................................................................................ 18

29 C.F.R. § 541.205(b) .................................................................................. 17, 23-24

29 C.F.R. § 541.207(a) .................................................................................... 17-18

29 C.F.R. § 541.601 ............................................................................................ 26

29 C.F.R. § 541.601(c) ........................................................................................ 26

29 U.S.C. § 213(a)(1) ......................................................................................... 16

## I.     __INTRODUCTION__

This is a collective action under the Fair Labor Standards Act in which former employees who worked as Logistics Account Executives ("LAEs") and/or Logistics Account Executive Trainees ("LAETs") for Total Quality Logistics, LLC ("TQL") claim that they were misclassified as exempt and, therefore, are entitled to overtime compensation. TQL now moves to decertify the LAE and LAET subclasses that the Court conditionally certified prior to discovery.

TQL is in the business of providing supply chain management and freight brokerage services to its customers, on whose behalf it handles the logistics of arranging, scheduling, and monitoring the shipment of their goods through its LAEs and LAETs. LAEs operate largely autonomously and effectively run their own businesses: they must seek out and acquire their own customers for which they perform all of the logistics services involved in moving their freight— all without direct oversight or supervision. These services include consulting with and advising customers on how they can move their goods more efficiently and cost effectively; selecting third-party motor carriers to move specific loads based on a number of factors, including their quality and price; checking with carriers to make sure they comply with all applicable federal and state law and regulations, as well as licensing requirements; communicating with carriers throughout transit to ensure on-time delivery; acting as liaison between customers and motor carriers; problem solving issues that arise during shipment (e.g., truck break downs, delays); and negotiating rates and entering into contracts with carriers and customers on behalf of TQL. Some LAEs also take on additional supervisory responsibilities, such as managing or training other LAEs and LAETs.

The actual duties that the individual LAE members of the collective actually performed, however, widely varied, largely due to the differing levels of success they had acquiring and keeping their own customers over time, as well as the lengths of their tenures with the company.

1

For example, one LAE obtained sufficient business to regularly manage the shipment of 80-100 of his customers' loads per week, with each load taking anywhere from 15-30 minutes to up to 8 hours per day to oversee. As a result, he spent nearly 100% of his time performing logistics duties for his customers. Other LAEs, in stark contrast, never landed a single customer during their LAE tenures and, accordingly, spent 100% of their time prospecting for new business, without ever providing any logistics services at all. Still other LAEs fell anywhere along this spectrum. The degree to which LAEs performed additional management duties for TQL also varied, with some regularly managing or training other employees while others never did so.

These differences materially impact the applicability of the administrative exemption to any given member of the collective. As a number of courts have held, employees who perform logistics duties similar to LAEs satisfy the administrative exemption, as their primary duty involves work related to the general business operations of their employer or its customers and requires the exercise of discretion and independent judgment regarding matters of significance. Those determinations, however, are highly individualized and fact-dependent. (*See cases cited infra*, at 18-20.) The same is true here. Determining the primary duty for any individual LAE will require an analysis of the specific duties he or she performed—including the time spent performing logistics duties on behalf of customers versus simply prospecting for new business—which dramatically differed from one LAE to the next. This variance in turn affects whether individual LAEs performed duties relating to the general business operations of their customers or TQL, and whether they exercised discretion or independent judgment. In addition, certain LAEs are subject to unique defenses, such as the statute of limitations or other FLSA exemptions, that will require individualized proof at trial. Because of these differences, it will be impossible to present representative testimony that would allow a common answer to whether TQL is liable to all LAEs.

So too the LAET subclass. LAETs receive the vast majority of their training from LAE mentors who determine at their own discretion what specific duties and leeway to give their LAETs, with the result that LAETs perform very different duties. Some LAET collective members acted as fully functioning LAEs, landing their own customers, moving their freight independently and without oversight, and handling all of the logistics duties for their LAE mentors' customers. Other LAETs, however, were given significantly fewer duties and next to no discretion, such as not being allowed to make any decisions without their mentor's approval. These LAETs never had their own customers and described themselves as "robots" who were "micromanaged." Still other LAETs fell everywhere between these extremes. Determining whether particular LAETs satisfy the administrative exemption will, once again, require individualized inquiries as to the duties they actually performed and whether they exercised discretion and independent judgment.

At the same time, the hours that the individual members of the collective actually worked cannot be determined on a representative basis. LAEs and LAETs did not have standard work schedules but, rather, worked as long as they needed to do their jobs. Some collective members always left the office at 5:15pm, while others regularly stayed 3-4 hours later; some never worked from home, while others worked up to 8 hours per week remotely; some never worked Saturdays, while others worked nearly every Saturday; some took an hour lunch every day, while others never did. TQL retained a labor economist who has opined that representative testimony cannot be used as a reasonable proxy to determine the overtime hours worked by individual members of the collective due to the wide range in the overtime hours they claim to have worked on average per week. Plaintiffs have not offered any expert or other evidence of their own to rebut this conclusion.

Because of the need for individualized inquiries regarding the duties that the members of the collective actually performed, other defenses unique to them, and the hours they worked,

Plaintiffs cannot satisfy their burden of demonstrating that the opt-in plaintiffs are "similarly situated." Accordingly, proceeding to trial as a collective would be unmanageable and fail to serve the interests of judicial economy, and both the LAE and LAET subclasses should be decertified.

## II.    FACTUAL BACKGROUND

### A.    Overview of TQL

TQL is a third-party logistics company "that works with customers to coordinate the successful arrangement of their product from origin to destination." (Deposition of Victor Nichols, TQL 30(B)(6) ("Nichols Dep."), attached as **Exhibit A**, at 33; Deposition of Christopher Fields, TQL 30(B)(6) ("Fields Dep."), attached as **Exhibit B**, at 19-20.) TQL does not own its own trucks but, rather, contracts with third-party motor carriers to move its customers' goods by truck, rail, or ship. (Nichols Dep. at 34, 50.) TQL handles shipments across all fifty states, as well as internationally. (*Id*. at 35.) TQL provides its customers with full service supply chain and freight management services through its LAEs and LAETs.

The values of the individual loads that customers ship through TQL range from a few thousand dollars to over $500,000 per load. (Fields Dep. at 133-34; **Exhibit C** at 2 (Account Application).) The load values that the members of the collective were responsible for moving fell throughout this range, with loads valued at $250,000, $225,000, $125,000, $70,000, $25,000, or only a few thousand dollars. (*See* **Exhibit D** (documents reflecting individual load values).)

### B.    The LAE Job

#### 1.    General overview of LAE duties.[1]

LAEs provide their customers with "logistics and supply chain management" services, acting as a single point of contact to handle everything involved in moving the customer's freight.

---

[1] This description of the duties that LAEs perform is predominantly drawn from the deposition testimony of the opt-in plaintiffs deposed in this action.

(Deposition of Jaccob Dean ("Dean Dep."), attached as **Exhibit E**, at 36 (as an LAE he provided "logistics and supply chain management" services with the goal "to basically complement the customer and take the headache away from them . . . of having to own a truck, pay a driver, pay driver's insurance, pay truck maintenance, pay tolls fines and fees . . . where you can just be a one-stop shop"); Deposition of Christopher Ferrill ("Ferrill Dep."), attached as **Exhibit F**, at 103, Ex. 72 (as an LAE he "[p]rovide[d] . . . supply chain management as a single point of contact for all [customers] of their logistics needs"); Deposition of Brian Hudgins ("Hudgins Dep."), attached as **Exhibit G**, at 78-81 (as an LAE he "[b]uilt and managed a logistics network from the ground up" and "[f]acilitated customers' shipping needs from time of pickup until delivery").)

The logistics duties that LAEs perform include (i) consulting with and advising customers on how to manage their shipments to lower costs and increase effectiveness; (ii) selecting specific carriers to move their customers' loads based on their quality and reliability; (iii) checking that carriers can move a load in accordance with applicable federal and state law and regulations; (iv) inquiring with drivers to ensure they comply with Department of Transportation limitations on the number of hours they can drive in a day; (v) negotiating and entering contracts with customers and carriers on behalf of TQL; (vi) monitoring load shipments through pick up, transit, and delivery; (vii) acting as liaison between customers and carriers; (viii) solving any and all problems that arise during shipment; and (ix) negotiating payments from customers and payments to carriers.[2]

---

[2] (Deposition of Mallory Millhouse ("Millhouse Dep."), attached as **Exhibit H**, at 41-42, 44-46, 54, 57-59, 73-74; Deposition of Adrianne Schmidt ("a Dep."), attached as **Exhibit I**, at 45, 53, 55, 58-60, 63-66; Deposition of Seth Abramson ("Abramson Dep."), attached as **Exhibit J**, at 37-38, 43-45; Deposition of Richard Blackmon ("Blackmon Dep."), attached as **Exhibit K**, at 24-26, 38-39, 47-48, 50; Deposition of Gary Schlack ("Schlack Dep."), attached as **Exhibit L**, at 34-36, 38-39; Hudgins Dep. at 30-32, 57, 69-70; Deposition of Joshua List ("List Dep."), attached as **Exhibit M**, at 28, 31-32; Deposition of Christopher Billingslea ("Billingslea Dep."), attached as **Exhibit N**, at 19-20, 25-26, 32-33, 62-63; Deposition of Christopher Flick ("Flick Dep."), attached as **Exhibit O**, at 56-58, 64, 79-80; Deposition of Patrick Hood ("Hood Dep."), attached as **Exhibit P**, at 42-47.)

Before they can perform any of these logistics services, however, LAEs must first bring in their own customers by "prospecting," which involves selecting an industry or type of good to target, researching companies, and making cold calls to build a relationship and attempt to earn a potential customer's business. (Deposition of Andrew Burks ("Burks Dep."), attached as **Exhibit Q**, at 24-27; Schmidt Dep. at 19-22.) LAEs can select any industry or potential customer that they choose to target. (Deposition of William Schulenberg ("Schulenberg Dep."), attached as **Exhibit R**, at 16.) Prospecting often involves making a number of calls to the same potential customer before a load is ever tendered, during which the LAE learns about the customer's business, how it is currently shipping its freight, any problems it is having with supply management, and offering potential solutions should the customer use the LAE to handle its logistics. (Abramson Dep. at 36-38; Blackmon Dep. at 22-26; Burks Dep. at 24-27; Hudgins Dep. at 29; Schulenberg Dep. at 20-24; Flick Dep. at 61-64.) What to say on these calls is entirely up to the LAE, including coming up with their own preferred communication strategies. (Millhouse Dep. at 12-13.) The amount of time that any given LAE spends performing logistics duties versus prospecting can widely vary, largely based on how successful the LAE is at landing customers. (*See infra*, at 21-22.)

Any customers that LAEs land through prospecting (or which may be transferred to them) become that LAE's "book of business," which TQL allows the LAE to run with relative autonomy. (Schmidt Dep. at 81-82 ("TQL is a company but everybody who works there is making their own company . . . my job there was to create my book of business"); Deposition of Derek Cimala ("Cimala Dep."), attached as **Exhibit S**, at 79 ("[W]e all have our own book and we all have to take care of our own customers. Nobody helps anyone else."); Blackmon Dep. at 18 (the customers he landed were his "book of business" and "it was up to [him] to move [their loads]"); Millhouse Dep. at 54 (same).) LAEs are the ones who are ultimately responsible for moving their customers'

6

freight. (Flick Dep. at 42; Schmidt Dep. at 82 (LAEs act "independently," and she was "the one in charge of [her] account").) They are "pretty much left alone" to run their "book[s] of business" (Deposition of Amy Collotta-Williams ("Collotta-Williams Dep."), attached as **Exhibit T**, at 96), which includes making nearly *all* decisions "on [their] own without someone telling [them] what to do" and using "a lot of discretion" and "exercises of judgment" (Billingslea Dep. at 42-45). LAEs act "independently" without any direct oversight or management. (Deposition of Michael Pearce ("Pearce Dep."), attached as **Exhibit U**, at 8 (no one at TQL assisted him in moving his customers' goods); Hudgins Dep. at 88; Deposition of Jonathan Tweed ("Tweed Dep."), attached as **Exhibit V**, at 13-14; Deposition of Jimmie Warren ("Warren Dep."), attached as **Exhibit W**, at 54; Deposition of Steven Zidow ("Zidow Dep."), attached as **Exhibit X**, at 44.)

Performing logistics duties requires highly specialized knowledge. For example, in selecting a carrier to move a load, an LAE must be aware of and check with carriers that they comply with all applicable laws and regulations, such as federal weight and size limits; federal food safety laws (e.g., requiring truck washouts for certain load types); licensing requirements set by the Federal Motor Carrier Safety Administration; state clean air laws that limit the types of trucks that can go in our out of particular states; state regulations requiring permits or escorts for certain types or sizes of loads; and local rules restricting the hours when trucks can be on the road. (Abramson Dep. at 33-34; Blackmon Dep. at 37-39; Billingslea Dep. at 32-33; Millhouse Dep. at 44-49; Schmidt Dep. at 53; Deposition of Joshua Taylor ("Taylor Dep."), attached as **Exhibit Y**, at 66-68; Deposition of Chad Warner ("Warner Dep."), attached as **Exhibit Z**, at 22-23.) LAEs must also be aware of Department of Transportation regulations on how many hours drivers can spend on the road in a day and confirm that carriers will not violate these regulations based on the length of the route and the time they have already spent behind the wheel; the LAE must also

calculate whether the delivery date and drop off location requested by a customer are possible to meet given the driving distance and the hours limits. (Abramson Dep. at 43-45; Blackmon Dep. at 50; Cimala Dep. at 61-63; Deposition of Zachary Young ("Young Dep."), attached as **Exhibit AA**, at 22.) LAEs moving loads across international borders must be aware of and check that carriers comply with customs requirements. (Burks Dep. at 32-34.) An LAE's failure to do so could cause significant harm to a customer; for instance, if a truck moving a $100,000 refrigerated load of food was stopped for violating Department of Transportation regulations, that load could spoil and be entirely lost. (*See, e.g.*, Schlack Dep. at 38; Tweed Dep. at 29-30.)

LAEs also perform quality control on the carriers they select to move loads. TQL has tens of thousands of pre-approved carriers that LAEs can choose from to move a particular load. (Hudgins Dep. at 63-64.) The specific carrier they choose is entirely up to the LAE, generally without any supervision or approval necessary. (Hudgins Dep. at 64.) When looking for a carrier, LAEs must screen out those who cannot legally or physically move the load, as carriers will often call in even though they would violate applicable law (e.g., because their trucks are too heavy or illegal in the state in question), or when they do not have the right size or shape of truck for the good (e.g., trucks have different interior sizes/shapes and may not be able to carry the load). (Deposition of Devin Duggan ("Duggan Dep."), attached as **Exhibit BB**, at 34-35; Abramson Dep. at 43-44; Hudgins Dep. at 51-52; Millhouse Dep. at 41-42.) Once LAEs confirm that a carrier can move a load, they then select the specific carrier to use based on a number of factors, including the carrier's reliability and price. (Deposition of Max Amberg ("Amberg Dep."), attached as **Exhibit CC**, at 31-34; Blackmon Dep. at 29-30.) Because customers do not have the same experience with carriers, an LAE's ability to find more reliable carriers at reasonable prices is a significant value they provide. (Amberg Dep. at 33-34; Blackmon Dep. at 25-26.)

The prices that TQL pays carriers and charges its customers are also entirely negotiated and agreed to by its LAEs. (Millhouse Dep. at 54-56.) LAEs negotiate and enter contracts with both customers and carriers without needing prior approval. (*Id*.; Abramson Dep. at 93.) Negotiating the rate that a carrier will be paid can in turn mean a lower overall price for the customer to move its goods. (Deposition of Adam Lambert ("Lambert Dep."), attached as **Exhibit DD**, at 65-66.) There are no restrictions on the prices LAEs can quote and charge customers or carriers; for instance, an LAE might choose to lose money on a load (by paying the carrier more than the customer pays TQL) without needing a supervisor's approval. (Millhouse Dep. at 54-56.)

After a carrier is booked and a load is being shipped, LAEs must constantly communicate with the carrier and their customers, serving as a liaison between the two and providing continual updates to ensure on time delivery. (Schmidt Dep. at 63-66.) LAEs usually check in with drivers multiple times a day to determine the carrier's location, whether they are on schedule, and to make sure the carrier is complying with any specific load requirements (e.g., a refrigerated unit is being kept at the proper temperature). (Schmidt Dep. at 63-68; Millhouse Dep. at 32, 62-63.) The LAE reports back to the customer as the load's transit continues. (Schmidt Dep. at 66-68.)

LAEs must also creatively problem solve how to address the numerous issues that may and often do arise during shipment, such as broken-down trucks, flat tires, weather delays, or problems during pick up or delivery. (Millhouse Dep. at 71-72 (describing how "[l]ogistics is a problem. . . . You're solving problems" "all day long," because "[i]t's one fire after the other").) Problems "regularly" come up during shipment, and when they do, it is the LAE's duty "to figure out how to solve the problem." (Billingslea Dep. at 28; Deposition of Michael Harris ("Harris Dep."), attached as **Exhibit EE**, at 29.) For example, if a truck breaks down, the LAE must decide whether to wait for the truck to be repaired or whether to find a replacement carrier, given the particular

timing needs for the load and the customer. (Warren Dep. at 43-45.) The same is true when a carrier arrives to pick up a food load but has not been washed out as required by law. (Blackmon Dep. at 52-53.) Weather might delay or prevent the good's movement, in which case the LAE must locate a storage location—one with the proper climate to maintain the goods being transported—to wait it out. (Hudgins Dep. at 69-71.) When truck drivers are sometimes forced to wait for hours to pick up or unload, LAEs may have to negotiate "detention," or payments to compensate the driver for the additional time; this amount is often paid by the customer, and the LAE negotiates the rate on the customer's behalf. (Schmidt Dep. at 60-61; Flick Dep. at 79-80.)

Faced with these and myriad other issues that regularly come up in providing logistics services, many members of the collective described the LAE job as "challenging" and one that "required a lot of thinking." (*See, e.g.*, Schlack Dep. at 42 (LAE job was "pretty challenging" and involved "a lot of problem solving" and "required a lot of thinking"); Millhouse Dep. at 90 (LAE job required "a lot of thinking . . . [b]oth strategic and exercise a judgment" and was a "challenging job" that "mixes a lot of skill sets"); Schmidt Dep. at 125-27 (logistics required "a lot of thinking, problem solving, to figure out," and the job was "challenging" and "stressful"); Cimala Dep. at 64, 72 (logistics is "fairly challenging" and requires "put[ting] fires out"); Burks Dep. at 42-44 (all his loads "were fairly challenging to move" and he "never had any routinely easy loads").) As one LAE explained, the "movement of freight [is] . . . a difficult industry. . . . [F]reight is kind of a headache as an industry, so to speak, it's difficult to do and manage, and that was one of the things we were offering." (Hudgins Dep. at 31-32.)

### 2. LAEs act as transportation advisors to their customers.

In addition to moving their customers' loads, LAEs also take on the role of a "transportation advisor," providing general guidance to their customers on how they can better move and handle

their freight, including finding ways to do so more efficiently and cost-effectively.  (*See, e.g.*, Fields Dep. at 91-92 (LAE is "common[ly]" referred to as a "[t]ransportation advisor"); Duggan Dep. at 27 (he "absolutely" acted as a "transportation advisor" to his customers); Deposition of Francisco Perez ("Perez Dep."), attached as **Exhibit FF**, at 62-63 (acted as an "advisor" and offered "needs assessment" and proposed solutions, such as how to improve "efficiency"); Schmidt Dep. at 21-22 (gave customers advice on how to improve their shipping in general without regard to specific loads); Billingslea Dep. at 62-63.)  These duties include providing a needs assessment to determine how customers are currently moving their goods, determining what issues they are having, and offering "advice or suggestions as to how [customers] might better or more expeditiously ship their products."  (Billinglsea Dep. at 62; Schulenberg Dep. at 46-47 (would assess customers' "transportation needs" and develop "transportation solutions for them").)  LAEs "advis[e] [their customers] on ways to save money, ways to be a little bit more efficient," and so customers "value [the LAE] more than just moving their freight."  (Duggan Dep. at 27-28.)

For example, LAEs might advise their customers to consider using a dedicated carrier (i.e., contracting with a single carrier to exclusively ship its products to a certain destination) because it would be cheaper and more reliable over time than looking to the market to find any available carrier each time they had a load to move.  (Duggan Dep. at 27-28.)  LAEs might also recommend changing a customer's shipment schedule to make its freight movements less expensive and/or more efficient.  (Dean Dep. at 57-59.)  They might suggest using a tandem driver—i.e., two or more drivers working as a team rather than a single driver—to move products faster over longer distances that would otherwise violate Department of Transportation hours regulations with only one driver.  (Billingslea Dep. at 62-63; Schmidt at 26-27.)  LAEs would also act as "educat[ors]" and teachers to their customers, who were often ignorant of legal requirements like the National

Motor Freight Carrier classification system—which can impose financial penalties for the failure to correctly classify goods prior to shipping—and the LAEs would advise their customers on what the requirements are and help them comply to avoid the penalties. (Burks Dep. at 93, 96-98.) LAEs might also suggest that their customers consider using different types of trucks to lower their costs or better find carriers on short notice. (Schlack Dep. at 34-35; Warren Dep. at 21.)

### 3. Some LAEs perform additional management duties for TQL.

Some LAEs take on additional management or administrative roles on behalf of TQL, although when they assume these duties and how long they perform them varies. For example, one member of the collective became a "founding member" of a new office that TQL opened (while remaining an LAE), in which capacity he was responsible for helping "grow the office" and coaching and mentoring other LAEs to increase their performance, as well as performing other "administrative responsibilities," such as working as an Accounts Receivable Team Captain. (Ferrill Dep. at 58, 90-92.) Other LAEs acted as mentors and trainers to LAETs, which involved spending significant portions of their time training LAETs side-by-side, including setting their day-to-day duties and overseeing their growth and performance. (Blackmon Dep. at 21-22; Cimala Dep. at 102; Duggan Dep. at 40; Ferrill Dep. at 75; Hood Dep. at 77-78; Millhouse Dep. at 33; Pearce Dep. at 10; Taylor Dep. at 40; Zidow Dep. at 44-45.) Some LAEs took on the role of a Prospecting Team Leader, who was responsible for managing prospecting captains, scheduling training with LAETs, reviewing LAETs' performance, and preparing reports and providing feedback to the LAETs. (Abramson Dep. at 22-23; Schmidt Dep. at 161, 163-64; Ferrill Dep. at 87.) Others spent time working in accounts management, such as claims administration or accounts receivable. (Collotta-Williams Dep. at 102-3; Ferrill Dep. at 92; Zidow Dep. at 7.) Still other LAEs worked as Saturday Group Leaders, managing teams of up to 25-30 LAEs and LAETs,

including setting their schedules, ensuring they show up on time, assigning accounts, and advising on how to move loads. (Millhouse Dep. at 112-13; Ferrill Dep. at 57; Pearce Dep. at 73-75.) In contrast, other LAEs never took on any additional management responsibilities, such as mentoring an LAET, and spent all of their time performing either logistics or prospecting duties. (*See, e.g.*, Warner Dep. at 9.)

### 4. LAE compensation.

LAEs earn $35,000 per year in base salary with the opportunity to earn commissions. (Deposition of Marc Bostwick, TQL 30(B)(6) ("Bostwick Dep."), attached as **Exhibit GG**, at 13-16.) Some LAEs earn compensation of more than one million dollars per year. (Declaration of Dennis Ferguson ("Ferguson Decl."), R. 49-1, Page ID # 357.) One member of the collective was on pace to earn nearly $116,000 in the year he quit, while others earned over $70,000 per year. Other members of the collective never earned commission and received only their base salaries.[3]

### C. LAET Training

Prior to becoming an LAE, new TQL hires must undergo extensive training to learn everything necessary to perform the LAE role, such as general background knowledge about the logistics industry, applicable laws and regulations, truck types and sizes, weight classes, timing restrictions, and TQL's internal policies and software. (Deposition of Mohammed Abour ("Abour Dep."), attached as **Exhibit II**, at 10-11.) The purpose of the training is to turn a new hire into a fully functional LAE. (Hood Dep. at 104-5; Schmidt Dep. at 168.) The length of the training varied among the members of the collective, based on a given LAET's ability, pace of learning, desire to leave training early, and approval of the office leader. (Nichols Dep. at 54-55; Flick Dep.

---

[3] Documents demonstrating the amounts that various LAEs and LAETs earned in salary are attached as **Exhibit HH**. Certain of these documents relate to plaintiffs who worked less than a full calendar year for the period involved and, therefore, may have earned less than $35,000.

at 12; Deposition of Bryan Tyson ("Tyson Dep."), attached as **Exhibit JJ**, at 68-69.)  For many, the training lasted five or six months.  (Nichols Dep. at 63.)  Others, however, trained for as little as three months (Deposition of William Bayles ("Bayles Dep."), attached as **Exhibit KK**, at 5-6; Collotta-Williams Dep. at 4), although TQL did not keep records of when individuals ended their training and became LAEs.  Leaving the LAET training was not considered a promotion; it simply meant that the individual was no longer a trainee.  (Nichols Dep. at 52-53.)  LAETs earn $35,000 per year in salary without the opportunity to earn commission.  (Bostwick Dep. at 14, Ex. 35.)

LAETs typically work side-by-side with an LAE mentor to whom they are assigned on their first day and usually sit immediately next to on the floor.  (Warner Dep. at 42-43; Warren Dep. at 66; Schlack Dep. at 14-15.)  TQL does not have a set policy on how LAETs are to be trained; rather, what LAETs are or are not allowed to do is determined by their LAE mentors. (Ferguson Decl. at Page ID # 358, ¶ 14.)  Training is "hands on" (Cimala Dep. at 106-7), and the LAE is the one who "dictate[s] the duties you would do on a day-to-day basis" (Schlack Dep. at 14-15; Burks Dep. at 126-27 ("majority" of training came from LAE)).  The LAET members of the collective explained that their LAE mentors gave them very different duties to perform, including varying levels of discretion and the opportunities to act on their own.  (Tweed Dep. at 53-54 (describing LAETs who were "limited on what they could do on their LAE's account," including needing permission to choose a carrier or problem solve).)  As discussed below, some were allowed to do everything an LAE would do and effectively ran their LAE's accounts or even had customers of their own; others, however, were given little to no opportunity to make decisions, as their LAE mentors treated them like "robots" and "micromanaged" them.  (*See infra*, at 26-29.)

Outside of the training they receive from their LAE mentors, LAETs typically spend two weeks of half-day classroom sessions at the beginning of their training learning the background on

logistics and TQL's systems. (Schulenberg Dep. at 68-69.) After this training, essentially all other training comes from their LAE mentors, although LAETs may also receive two weeks of half-day sales training in the classroom (Tweed Dep. at 47), but this training is not mandatory and varied among the members of the collective (Billingslea Dep. at 77, 118-19 (explaining that he did not receive any sales training and that his LAET duties were "purely logistics").)

### D.   The Members of the FLSA Collective

On December 23, 2016, this Court conditionally certified two subclasses of LAEs and LAETs and approved the provision of notice. (R. 53.) Ultimately, 230 former LAEs and/or LAETs opted in and the parties proceeded with discovery. Over time, 88 opt ins were dismissed or voluntarily withdrew their claims, leaving a total of 142 members of the collective. TQL took the depositions of 34 opt-in plaintiffs, 32 of whom served as both LAETs and LAEs, and two of whom served only as LAETs. These plaintiffs worked in 11 different TQL offices, for time periods ranging from less than eight weeks (Samantha Joseph) to nearly four years (Steven Zidow).

## III.   STANDARD OF REVIEW

In an FLSA action, "following the completion of the opt-in process and further discovery, the defendant may ask the Court to reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis." *Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 933 (N.D. Ill. 2008) (Kennelly, J.) (internal quotation omitted). To continue as a collective action, "the plaintiffs must demonstrate similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present." *Russell v. Ill. Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 812 (N.D. Ill. 2010) (Kennelly, J.) (internal citation omitted).

"Plaintiffs bear the burden of demonstrating that they are 'similarly situated.'" *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 345 (N.D. Ill. 2012). To make that determination, courts analyze "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Id*. "If the Court determines that such similarities do not exist, it may revoke the conditional certification" it granted during the first stage. *Russell*, 575 F. Supp. 2d at 933.

"A collective action is not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry." *Camilotes*, 286 F.R.D. at 346. Courts must consider "whether defendants' defenses could be applied across the board to plaintiffs' claims and potential plaintiffs' claims or whether many and perhaps disparate defenses could be raised." *Russell*, 721 F. Supp. 2d at 820 (internal quotation marks and citation omitted). Where a court must engage in individualized inquiries to determine the applicability of an affirmative defense, decertification is favored. *See Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 105 (N.D. Ill. 2013) ("[E]vidence of variations in the plaintiff's job duties will require individualized inquiries into whether each plaintiff was exempt, and therefore this factor favors decertification[.]").

## IV.   ARGUMENT

### A.   The Administrative Exemption Under the FLSA

#### 1.   Overview

The FLSA's overtime requirement does not apply to individuals "employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). This administrative exemption covers any employee who is

> (1)   Compensated on a salary or fee basis at a rate not less than $455 per week;

      (2)     Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

      (3)     Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  Because all LAEs and LAETs earned at least $35,000 in salary per year (Bostwick Dep. at 14), the first prong is not in dispute here.

An "employee's primary duty is that which is of principal importance to the employer, rather than collateral tasks which may take up more than fifty percent of his or her time." *Demos v. City of Indianapolis*, 302 F.3d 698, 705 (7th Cir. 2002) (rejecting argument that employee's primary duty was what he spent the majority of his time performing); *see also DeWalt v. Greencroft Goshen, Inc.*, 902 F. Supp. 2d 1127, 1135 (N.D. Ind. 2012) (holding that even though "sales tasks consumed more than 50% of [the plaintiff's] work time, her primary duty was still related to [her employer]'s management and directly related to its business operations").

"Work directly related to management or general business operations of the employer or the employer's customers" means that "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).  Such job responsibilities include, but are not limited to, "legal and regulatory compliance," "quality control," "procurement," "negotiating," "representing the company," "purchasing," "personnel management," and "accounting." 29 C.F.R. §§ 541.201(b), 541.205(b). They also include "acting as advisers or consultants to their employer's clients or customers." *Id*. at § 541.201(c); *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 981 (7th Cir. 2011).

"[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various

possibilities have been considered." 29 C.F.R. § 541.207(a). Employees satisfy this prong where they "work[] largely alone, and [are] not subject to strict oversight and control in the performance of their duties." *Blanchar v. Std. Ins. Co.*, 736 F.3d 753, 758 (7th Cir. 2013); *see also* 29 C.F.R. § 541.202(c) ("The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision.").

### 2. Courts have applied the administrative exemption to employees who perform similar job duties to LAEs and LAETs.

A number of courts that have considered whether the administrative exemption applies to employees whose duties were similar to those performed by LAEs and LAETs—including handling the logistics of moving their employers' or their customers' freight—have determined that such employees are exempt under the FLSA. *See, e.g.*, *Puentes v. Siboney Contracting Co.*, No. 11-80964, 2012 U.S. Dist. LEXIS 150727 (S.D. Fla. Oct. 19, 2012); *Perine v. ABF Freight Sys., Inc.*, 457 F. Supp. 2d 1004 (C.D. Cal. 2006); *D'Angelo v. J&F Steel Corp.*, No. 01-cv-6642, 2003 U.S. Dist. LEXIS 6273 (N.D. Ill. Apr. 14, 2003); *Wade v. Werner Trucking Co.*, No. 2:10-cv-270, 2014 U.S. Dist. LEXIS 35653 (S.D. Ohio Mar. 18, 2014).

In *Puentes*, for example, the court granted summary judgment to an employer whose business involved providing trucking services for its customers by brokering with independent truck operators to transport and deliver their goods. 2012 U.S. Dist. LEXIS 150727, at *1-2. The plaintiff "oversaw the brokering of trucking services" and was "in charge of all activities relating to the daily dispatch and running of the trucking services." *Id*. at *14, 22. His duties included selecting the specific carrier for individual loads, coordinating and scheduling transit, dealing with all problems that might come up during shipment (e.g., late drivers, accidents), and acting as a liaison between the customer and delivery sites. *Id*. at *14. The court held that this work directly related to the general business operations of his employer because he "was in charge of all activities

relating to the daily dispatch and running of the truck services." *Id*. It further concluded that the plaintiff's "unfettered ability to choose truck drivers . . . clearly required [the] use of discretion and independent judgment." *Id*. at *20.

Similarly in *D'Angelo*, the court granted summary judgment for an employer where the plaintiff was a "shipping manager" whose responsibilities involved overseeing the shipment of her employer's goods to its customers. 2003 U.S. Dist. LEXIS 6273, at *2. Her duties included dispatching and scheduling drivers, making arrangements for pickups, overseeing shipments, dealing with customer issues, and solving problems that arose during transit. *Id*. at *2-5. The court held that these duties related to her employer's general business operations because "[h]er primary responsibilities involved coordinating steel delivery, without which [her employer] would have ceased to function." *Id*. at *18. It further concluded that "[s]everal duties, such as coordinating shipping and dealing with customer problems, clearly demonstrate plaintiff's use of discretion and independent judgment." *Id*. at *13-14.

In *Perine*, the court granted summary judgment to an employer whose employee managed the movement of its customers' freight, including assigning drivers to trucks, ensuring compliance with Department of Transportation guidelines, ensuring timely delivery, and handling complaints. 457 F. Supp. 2d at 1007-9. The court held that the plaintiff's work related to the general business operations of his customers because his duties included, among other things, "conform[ing] his [route] assignments to the Department of Transportation guidelines." *Id*. at 1015-16. Furthermore, his duties involved the exercise of discretion and independent judgment in assigning specific drivers to handle particular loads, which he did without direct supervision. *Id*. at 1016.

Finally, the court in *Wade* considered whether the administrative exemption applied to ten "fleet managers" whose "primary responsibility was overseeing truck fleets to ensure that

deliveries were completed safely and on time." 2014 U.S. Dist. LEXIS 35653, at *2, 78. In a decision aptly demonstrating the inability to apply the administrative exemption on a representative basis for employees performing logistics duties, the court granted summary judgment in favor of the employer for six of the ten employees but found there to be genuine disputes of material fact for the other four. *Id*. at *93. While all ten fleet managers held the same title, the court held that it needed to separately analyze the specific duties of each employee to determine whether the administrative exemption applied, and that resolution of the issue for plaintiffs who had not been deposed was impossible. *Id*. at *6-7. For the six employees subject to summary judgment, the court concluded that their "primary duty, overseeing trucks and truck drivers operating within their jurisdiction during their shift, was non-manual office work directly related to the management and business operations of [their employer]," and that this work involved the exercise of independence and discretion, because these employees "managed drivers, planned loads, scheduled drivers, worked with drivers on safety issues, and worked with the customer to maintain a good relationship between [his employer] and [the customer]." *Id.* at *56, 80. For the remaining employees, summary judgment was inappropriate because there were questions of fact regarding whether they actually exercised independence or discretion. *Id*. at *93.

### B. The LAE Subclass Should Be Decertified

#### 1. The specific duties that individual LAEs actually performed varied widely across the members of the collective.

Plaintiffs cannot satisfy their burden of demonstrating that the LAE members of the collective are similarly situated due to the significant differences in the day-to-day duties and responsibilities that they performed. These differences largely arise from the number of customers the LAEs were able to acquire and the amounts of time they spent performing logistics duties for their customers versus simply prospecting to bring in new business.

For example, the number of loads that the members of the collective were responsible for moving per week significantly differed. The amount of time it takes to move an individual load can vary from 15-30 minutes in a day to up to 8 or 9 hours in a day for a single load, depending on the load's difficulty. (Billingslea Dep. at 63-64.) One LAE testified that he often moved at least 80 of his customers' loads per week, and up to 100 loads per week. (*Id*. at 23-25.) Another stated that, on average, she moved 40-60 loads per week. (Millhouse Dep. at 173.) In contrast, some LAEs never moved a single load in their entire LAE tenures because they never had any customers. (Bayles Dep. at 17, 23; Lambert Dep. at 55.) Still other LAEs averaged moving anywhere between 1 and 20 loads per week. (*See, e.g.*, Pearce Dep. at 9 (20-30 per week); Zidow Dep. at 46-47 (20 per week); Duggan Dep. at 31 (same); Ferrill Dep. at 46-47 (10-15 per week); Hood Dep. at 89 (10-20 per week); Hudgins Dep. at 71 (same); Schlack Dep. at 42 (5 per week); Deposition of Chad Hawley ("Hawley Dep."), attached hereto as **Exhibit LL**, at 47 (2-3 per week); Schmidt Dep. at 90 (same); Warner Dep. at 33 (same); Amberg Dep. at 39 (less than 2 per week); Deposition of Daniel Trost ("Trost Dep."), attached hereto as **Exhibit MM**, at 41 (same).)

These differences in the number of loads that LAEs moved per week, along with the dramatic disparities in the amounts of time it could take to move a particular load, greatly impacted the amounts of time that the members of the collective spent performing logistics versus prospecting duties. LAEs who moved significant numbers of loads performed nearly all logistics duties, because they had little to no time to prospect. (Billingslea Dep. at 23-24, 63-64.) Other LAEs with fewer loads per week still spent the majority of their time performing logistics services, or split their time evenly between logistics and prospecting duties. (Fields Dep. at Ex. 19 at 9-10, 12, 14, 16 (James Watson, Brian Arpaio, Joshua Taylor, Aaron Jacobs, Patrick Hood, and Adam

Sanford spent the majority of their time on logistics)[4]; Zidow Dep. at 51-52 (50/50 split between logistics and prospecting, although it could fluctuate from day-to-day and year-to-year).) Some LAEs changed over time from spending the majority of their time prospecting to performing nearly all logistics duties. (Tweed Dep. at 20, 43 (started out doing mostly prospecting but after three months performed 100% logistics for final ten months); Burks Dep. at 46-47, 77-78 (started out doing 70% prospecting but performed 90% logistics in final eleven months); Cimala Dep. at 93-94, 96 (started out doing 70% prospecting but performed majority logistics in final ten months); Dean Dep. at 57 (started out 90% prospecting but split evenly on logistics and prospecting in final half of his LAE tenure).) Other LAEs spent a large portion, but not the majority, of their time on logistics. (Young Dep. at 29-30 (40% of his time spent on logistics duties); Schlack Dep. at 43-44 (30-40% of his time spent on logistics duties).) Still other LAEs spent all or nearly all of their time simply prospecting for new business. (Bayles Dep. at 23; Lambert Dep. at 55; Amberg Dep. at 39-40.) Some LAEs could not identify one way or another whether they spent more time on logistics or prospecting. (Blackmon Dep. at 71; Pearce Dep. at 26-27.)

The values of the loads that LAEs moved also varied, with some moving loads for their customers worth over $200,000, while others moved loads worth only a few thousand dollars. (**Exhibit D**.) LAEs who never acquired any customers never moved a load of any value.

Some LAEs also performed a variety of additional management duties for TQL that other LAEs did not, including co-founding and growing a new office; mentoring, training, and coaching other LAEs and LAETs; providing administrative and accounts receivable services; and scheduling and overseeing Saturday work teams. (*See supra*, at 12-13.)

---

[4] In response to Plaintiffs' 30(b)(6) topic requests regarding information on opt-in plaintiffs' actual work duties, TQL's designee, Christopher Fields, interviewed TQL office managers who had knowledge about whether specific plaintiffs spent the majority of their work time on logistics duties versus prospecting.

### 2. These differences materially impact the applicability of the administrative exemption.

The determination of whether the administrative exemption applies to any given LAE will require an analysis of (i) what that LAE's "primary duty" was; (ii) whether that duty related to the management or general business of TQL or its customers; and (iii) whether the LAE exercised discretion and independent judgment with respect to matters of significance. The differing factual settings among the collective members will produce individualized answers to these questions.

For example, determining what any individual LAE's primary duty was will largely depend on how much, if any, time that LAE spent performing logistics duties versus prospecting. Those LAEs who spent the majority of their time providing logistics services to their customers will likely have "logistics" as their primary duty, whereas those who never had any customers at all will likely have "prospecting" as theirs.[5] For those LAEs who spent less than half, but still a significant portion, of their time on logistics duties, determining their primary duty will require an analysis of how much time they actually spent on logistics and whether that work was of "principal importance" to TQL. *Demos*, 302 F.3d at 705.

Whether an LAE's primary duty was logistics or prospecting will in turn impact the second and third prongs of the administrative exemption analysis. LAEs whose primary duty was logistics performed work that Department of Labor regulations recognize as relating to the general business operations of both their customers and/or TQL, including: "advis[ing] and consult[ing]" with their customers regarding their freight movement and supply chain management; "procur[ing]" carriers to transport their customers' freight; checking on "legal and regulatory compliance" through the carriers they select; performing "quality control" when selecting carriers; "negotiating" with

---

[5] What some opt-ins called "prospecting" actually involved making calls to prospective customers in which they performed needs assessments and offered prospective solutions, thereby more closely resembling "logistics" services.

carriers on their customers' and TQL's behalf; and "representing" TQL in entering contracts with carriers and customers. *See* 29 C.F.R. §§ 541.201(b)-(c), 541.205(b). Employees providing these types of logistics services satisfy the general business operations prong. *See, e.g.*, *Puentes*, 2012 U.S. Dist. LEXIS 150727, at *14; *Perine*, 457 F. Supp. 2d at 1015-16; *D'Angelo*, 2003 U.S. Dist. LEXIS 6273, at *18; *Wade*, 2014 U.S. Dist. LEXIS 35653, at *56; *see also Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 537-39 (7th Cir. 1999) (employee's work related to employer's general business operations where he "advis[ed] and consult[ed]" with clients, "wrote to clients indicating problems and suggesting solutions," "made suggestions to clients regarding how they could improve their efficiency," and "served as the primary contact" to employer customers). In stark contrast, LAEs whose primary duty was simply prospecting for new business likely did not perform any of these logistics services and may not satisfy the general business operations prong.

The same is true regarding the exercise of discretion and independent judgment. LAEs whose primary duty was logistics would have regularly exercised discretion and independent judgment, including determining what advice to provide customers; selecting which carriers to move their customers' load; determining what applicable law and regulations they must check that the carrier complies with; determining schedules and routes; problem solving issues; negotiating rates with carriers and customers; and negotiating the amounts of detention to pay on behalf of their customers. *See, e.g.*, *Puentes*, 2012 U.S. Dist. LEXIS 150727, at *20 (employee exercised discretion and independent judgment through "unfettered ability to choose truck drivers"); *Perine*, 457 F. Supp. 2d at 1016 (same); *Wade*, 2014 U.S. Dist. LEXIS 35653, at *56 (managing drivers and planning and scheduling drivers involved exercise of discretion and independent judgment). LAEs provided all of these duties independently and without direct oversight. *See Blanchar*, 736 F.3d at 758 (discretion and independent judgment prong satisfied where employees "work largely

alone" and are not "subject to straight oversight and control"). They also related to matters of significance, as some LAEs moved loads valued at over $200,000. In contrast, LAEs who did not have any customers or never made any logistics decisions may not have exercised discretion or independent judgment and may not have done so with regard to matters of significance.

That certain LAEs also took on management responsibilities for TQL further individualizes the analysis. Those LAEs who supervised, trained, or managed other LAEs or LAETs or took on other administrative duties were performing duties related to the management or general business operations of TQL, *Cooney v. City of Chicago*, 644 F. Supp. 2d 1061, 1068 (N.D. Ill. 2009), and "responsibilities [that] include[] supervising several employees . . . would necessarily require [an employee] to exercise discretion and independent judgment." *Piscione*, 171 F.3d at 537. These LAEs will require additional consideration of what specific administrative or management duties they performed, how much time they spent doing so, and how it affects their exemption status.

### 3. Certain LAEs face additional, unique defenses.

In addition to these differences impacting the application of the administrative exemption, several LAEs will face unique defenses requiring individualized proof at trial. For example, two collective members' claims (Justin Baker and Desiree Rogers) are barred by the statute of limitations based on internal TQL documents demonstrating that their employments ended on January 10, 2014, three years before the initial opt-in notice was sent.[6] Yet, these plaintiffs (who were not deposed) dispute the dates when they actually left TQL in their interrogatory responses, with Mr. Baker claiming his employment terminated in "February 2014" and Ms. Rogers on "January 19."[7] If the finder of fact determines that their employments ended on these later dates, they would be potentially eligible for compensation for some portion of their employments.

---

[6] Documents reflecting Justin Baker's and Desiree Rogers's termination date are attached as **Exhibit NN**.
[7] Justin Baker's and Desiree Rogers's interrogatory responses are attached as **Exhibit OO**.

Another member of the collective, Jonathan Tweed, testified that although he was an LAE from May 2013 to December 2014, he was regularly away from the office for weeks at a time for military service, during which time he did not perform any work for TQL and, therefore, could not be entitled to overtime compensation. (Tweed Dep. at 7-12.) The exact number of weeks that he served, however, are unclear from his testimony (*see id.* at 7-9) and TQL's records, and will be the subject of unique proof at trial. Other collective members may have similar gaps in their employment that would require individual testimony to identify since TQL's records do not do so.

Finally, one LAE, Michael Pearce, is potentially subject to the highly-compensated workers exemption, since he was on pace to earn nearly $116,000 in his final year at TQL prior to voluntarily leaving the company.[8] 29 C.F.R. § 541.601. The regulation provides that "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties," and that "a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties" under the administrative or executive exemptions, which need not be the employee's "primary duty." *Id.* at § 541.601(c). This lesser standard for satisfying the administrative exemption will require a separate analysis than for any other collective member.

**C.**     **The LAET Subclass Should Be Decertified**

    **1.**     **The actual duties and responsibilities that LAETs performed varied among the members of the collective.**

Because the day-to-day duties that individual LAETs performed were dependent on the LAE mentors to whom they were assigned, their own skill and aptitude, and whether they acquired their own customers, the actual duties that particular members of the collective actually performed

---

[8] Documents detailing that Mr. Pearce received $55,716.80 in 2014 prior to his voluntary termination on June 20, 2014 (25 weeks) are included in **Exhibit HH**, at 1-3.

significantly differed.  As one member of the collective explained, "*[e]very LAE gave their LAET different responsibilities*," and so determining what duties each LAET actually performed "*would depend on the LAE*."  (Zidow Dep. at 61-62 (emphasis added).)

For example, some LAEs allowed their LAETs to run the logistics side of their accounts as if they were full LAEs (often because it allowed the LAE to focus more time on other duties, such as prospecting).  (Schmidt Dep. at 169-70; Millhouse Dep. at 69-71, 81; Hawley Dep. at 21-22; Tweed Dep. at 52-53; Lambert Dep. at 51-52; Zidow Dep. at 57.)  As one LAET described it, she was "effectively acting as the LAE even though [she] [was] still a trainee," and that because her LAE felt comfortable enough to let her "own[] the logistic[s] sides of his accounts . . . I would just completely run his accounts."  (Schmidt Dep. at 169-170.)  Another LAET testified that only one month into her training, she "was running [her LAE]'s account," and that the LAE left all of the logistics decisions up to her.  (Millhouse Dep. at 68-71, 81.)  Others explained that when their LAEs were out of the office, they did all of the logistics duties for their LAE's account on their own.  (Hawley Dep. at 21-22 (when his LAE was out, he "ran everything myself" and "did everything that he would have done had he been there"); Zidow Dep. at 57 (same).)

Some LAETs even landed their own customers during their training periods, which—as with an LAE—became that LAET's own book of business, requiring them to provide all of the logistics services required by their customers without direct supervision or oversight.  (Abramson Dep. at 18-19; Perez Dep. at 28-29, 31-33; Flick Dep. at 41-44; Millhouse Dep. at 33-34.)  Two LAETs, for example, testified that they each landed over 12 customers during training, and that they were responsible for moving their freight.  (Abramson Dep. at 18-19; Flick Dep. at 43-44.)

For those LAETs who had their own customers or whose LAEs gave them free rein to run their accounts, they performed logistics duties and made critical decisions as would an LAE, acting

independently and without direct oversight. (Lambert at 61-62 (explaining that he performed the logistics duties for his LAE's account and worked "independent[ly]" of his LAE); Millhouse Dep. at 68-71 (she was "running [her LAE's] account" and handled all the logistics of moving loads).) For example, those LAETs were allowed to select, negotiate with, qualify, and book carriers on their own without any approval needed, including checking that carriers met all legal requirements. (Lambert Dep. at 49 (he had the "final decision" on qualifying and selecting carriers); Ferrill Dep. at 66; List Dep. at 18-20; Warner Dep. at 43-44; Millhouse Dep. at 68-71; Perez Dep. at 40-41.) They would monitor and oversee shipment of their customers' products, acting as liaison between carriers and customers, and also problem solve issues that arose during shipment without oversight from their LAEs. (Perez Dep. at 38-39; Ferrill Dep. at 37-38; Harris Dep. at 14-15, 28-29.) These LAETs were allowed to speak with their own customers or their LAE's customers, including consulting with and providing advice on moving their freight. (Millhouse Dep. at 67-68 ("I was talking to [her LAE's] clients all day, every day." "It was common for me. It's not common for most people. Most LAETs do not talk to their LAE's . . . clients."); Perez Dep. at 62-63 (acted as "advisor" to customers during training period); Abramson Dep. at 85-86; Schmidt Dep. at 172.)

Other LAETs were much more limited in the logistics duties that they were allowed to perform and the degrees of leeway they were given to make decisions. (Tweed Dep. at 53-54 (explaining that other LAETs had to get approval from their LAEs for all decision); Schlack Dep. at 19-21; Cimala Dep. at 110-12.) One LAET explained that he was given "a lot less flexibility" than other LAETs, and that his LAE "micromanaged" him and just "ordered [him] what to do." (Schlack Dep. at 19-20.) Another testified that he was not given the opportunity to exercise any discretion or independent judgment during his training, and that he "was a robot to the LAE," not making any decisions on his own and always requiring approval. (Cimala Dep. at 110-12.)

These LAETs typically could not perform any of the logistics duties LAEs normally do on their own without direct supervision and prior approval from their LAE mentors.  For example, some LAETs were never permitted to select, negotiate with, or book carriers without their LAE's sign off.  (Blackmon Dep. at 97; Burks Dep. at 131; Cimala Dep. at 110-12; Trost Dep. at 87-88.)  Others were never allowed to problem solve issues that came up, as their LAEs insisted on doing so themselves.  (Bayles Dep. at 15; Cimala Dep. at 112; Young Dep. at 49.)  Still others were never or only rarely permitted to speak to their LAEs' customers.  (Duggan Dep. at 76; Hood Dep. at 111; Cimala Dep. at 111; Billingslea Dep. at 79.)  Many LAETs never landed their own customers and, therefore, performed only those logistics duties that their LAE mentors allowed.  (Billingslea Dep. at 7; Bayles Dep. at 17; Hood Dep. at 15.)  Where a particular LAET falls along the spectrum—between having relatively few duties and little discretion to acting as a fully-fledged LAE—is highly variable and fact dependent.  (*See, e.g.*, Hood Dep. at 111-12 (describing how he was never allowed to speak to customers but could select carriers and negotiate rates, so long as they were within a range set by his LAE).)

### 2. The differences in duties performed by LAETs materially impact the applicability of the administrative exemption.

As with the LAE subclass, application of the administrative exemption to the LAET subclass will be highly individualized.  While nearly all LAETs agreed that their primary duty was providing logistics services (*see, e.g.*, Billingslea at 118-19; Ferrill at 65-66), whether individual LAETs satisfy the general business operations prong or the discretion and independent judgment prong will need to be determined by analyzing whether they had their own customers and/or what specific duties and discretion their LAE mentors chose to grant them.

Those LAETs who acted as full on LAEs—landing their own customers, and performing all of the same duties that an LAE does, including advising and consulting on transportation

management, procuring carriers to move loads, checking on legal and regulatory compliance, performing quality control in selecting carriers, and negotiating rates and entering contracts with customers and carriers—likely satisfy the general business operation and the discretion and independent judgment prongs, for the same reasons as their LAE counterparts.

Other LAETs, however, may not, as they either did not perform duties related to the general business operations of either TQL or its customers, or they did not exercise discretion and independent judgment in doing so. For example, some LAETs never had customers and were never allowed to speak to their LAE's customers, and so did not provide any consultation or advice on transportation management. Some had no discretion to select a carrier (which involved quality control and checking on regulatory compliance) or negotiate a rate with the carrier without needing prior approval. Some could not problem solve issues that arose during transit without their LAE mentors' approval, while others were never allowed to problem solve at all. LAEs whose duties were significantly limited in these ways, or who were never allowed to exercise discretion or independent judgment, may not satisfy the administrative exemption, whereas LAETs who performed many more duties with much more discretion very likely can.

### D. Significant Differences in the Hours that the Collective Members Actually Worked Further Requires Decertification of the LAE and LAET Subclasses

#### 1. Legal Standard

The Seventh Circuit has held that the inability to demonstrate damages on a class-wide basis through representative evidence can be grounds for decertification. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013). Decertification is not a *per se* rule but, rather, may be appropriate where individualized damages issues would predominate. *Dailey v. Groupon, Inc.*, No. 11 C 05685, 2014 U.S. Dist. LEXIS 119190, at *29 (N.D. Ill. Aug. 27, 2014). A number of courts in this district have relied on *Espenscheid* to decertify collective actions because of the

plaintiffs' inability to prove damages on a representative basis. *See, e.g.*, *id*.; *Solsol v. Scrub, Inc.*, No. 13 CV 7652, 2017 U.S. Dist. LEXIS 80801 (N.D. Ill. May 23, 2017); *Jacks v. DirectSat USA, LLC*, No. 10-cv-1707, 2015 U.S. Dist. LEXIS 28881 (N.D. Ill. Mar. 10, 2015); *Farmer v. DirectSat USA, LLC,* No. 08 CV 3962, 2013 U.S. Dist. LEXIS 79825 (N.D. Ill. June 6, 2013).

### 2. The actual hours worked by individual LAEs and LAETs widely varies.

The testimony of the 34 opt-in plaintiffs whom TQL deposed demonstrates that the hours worked by the members of the collective significantly differ. While TQL's set weekday schedule is M-F 7:45am to 5:15pm (Warner Dep. at 37; Young Dep. at 34), LAEs and LAETs typically work the "hours necessary to get the job done" (Dean Dep. at 60). Collective members often worked significantly more hours than required, while others worked fewer (e.g., by taking lunch breaks). Whether to come in early or stay late was at the individual's discretion. (Deposition of Shawn Crawford ("Crawford Dep."), attached as **Exhibit PP**, at 74-75, 81.) TQL's offices were open 24/7 for those who wanted to work earlier or later. (Tyson Dep. at 36.) LAEs and LAETs could also work remotely from home. (Abour Dep. at 41-42.) This flexibility means that the hours worked by a given collective member are not reflective of those worked by any other.

For example, several LAEs and/or LAETs testified that they rarely worked in the office longer than the set schedule, while others worked significantly more hours. (Flick Dep. at 93-94 (explaining that as an LAE and LAET he almost always left the office at 5:15pm and did almost no work from home); Cimala Dep. at 141 (left any time between 5:30-8:30pm); Burks Dep. at 106-8, 115-16 (often worked until 7:45pm but left anywhere between 5:15pm and 9pm); Millhouse Dep. at 95-98 (typically worked at least until 8:15-9:15pm and sometimes until midnight).) The hours an individual LAE or LAET worked could also swing dramatically from one week to the next. (Deposition of Samantha Joseph ("Joseph Dep."), attached as **Exhibit QQ**, at 53 (worked between 45-65 hours per week); Millhouse Dep. at 142 (worked between 50-70 hours per week).)

Individual members of the collective also differed on whether and to what extent they worked additional hours from home. Some testified that they regularly worked significant additional hours from home each week, although the specific amounts differed from one to the next. (*See, e.g.*, Perez Dep. at 49-50 (worked on average an additional 8 hours per week at home); Abramson Dep. at 81-82 (2-5 hours); Abour Dep. at 41-42 (2.5 hours); Burks Dep. at 121 (2 hours); Zidow Dep. at 82 (up to 5 hours per night at home).) Others testified that they never or only very rarely ever worked from home. (Flick Dep. at 93-94; Taylor Dep. at 104 (as LAET).) Still others testified that the amount they worked from home changed over time, starting with zero hours per week for the first several months as an LAET and increasing to several hours per week by the end. (Tweed Dep. at 59-60; Warner Dep. at 55-56.) An LAE who worked on average 8 hours more per week than someone who did not would work 448 more overtime hours per year.

Most LAEs and LAETs were also scheduled to work from 8am to 12pm between one and four Saturdays a month, although the specific number required differed from employee to employee. (Bostwick Dep. at 56-57; Crawford Dep. at 23.) Some TQL offices allowed LAEs and LAETs to pick up or drop Saturday shifts at their discretion, often by paying another employee to work in their place or being paid to do so. (Deposition of Hillary Kotlarz ("Kotlarz Dep."), attached hereto as **Exhibit RR**, at 130-31.) These LAEs and LAETs were not required to make up a Saturday if they had someone take their place, and TQL did not track who actually worked on a given Saturday. (*Id.*; Warner Dep. at 37-38, 53-54 (explaining that every other Saturday he paid someone to work his shift, that he did not make it up, and that TQL did not track it.) One LAE explained that he regularly worked three Saturdays per month despite only being required to work one. (Young Dep. at 34, 36.) Other LAEs did not work on Saturdays at all. (Burks Dep. at 116-17; Cimala Dep. at 126-28.) Still other LAEs worked one or two Saturdays per month. (*See,*

*e.g.,* Shulenberg Dep. at 63 (one); Hudgins Dep. at 99-100 (two).)  An LAE working three Saturdays per month would have 168 more overtime hours per year than someone who did not.

Testimony also varied on taking lunch breaks.  Some LAEs and LAETs testified that they never took any lunch breaks (Dean Dep. at 63; Schulenberg Dep. at 62; Cimala Dep. at 142; Hudgins Dep. at 98; Trost Dep. at 73), while others took up to one-hour lunch breaks every single day (Billingslea Dep. at 87-88, 91; Flick Dep. at 106-7; Hawley Dep. at 62-63).  An employee who never took lunch would work 5 more hours per week than one who always took one-hour lunches, for a difference of 280 overtime hours over the course of a year.

> **3.** **Because of the extreme differences in hours worked per week, representative conclusions about the amount of overtime worked by any individual member of the collective cannot be reasonably drawn.**

TQL retained labor economist Paul F. White of Resolution Economics, LLC to review the evidence regarding the hours the members of the collective claim to have worked and to determine whether this information is sufficient to reasonably estimate the hours worked by the individual members of the collective on a representative basis.  (Analysis of Claimed Work Hours for Logistic Account Executives and Logistic Account Executive Trainees at Total Quality Logistics, LLC, Paul F. White ("White Rep."), attached hereto as **Exhibit SS**.)  He concluded that the hours vary too significantly to draw statistically meaningful conclusions regarding the hours worked by any particular member of the collective and will require individual evidence to calculate.  (*Id.* at 10.)

For those LAEs whose hours he could reasonably compute from their deposition testimony,[9] Dr. White calculated the average estimated total hours worked per week to be 54.1,

---

[9] Dr. White could not reasonably compute the hours worked for a number of LAEs/LAETs, as their deposition testimony was too vague, too indecisive, or too varied to calculate an average per week.  (*Id.* at 6-8.)  Based on the number of these plaintiffs, Dr. White concluded that he could be 95% confident that between 30% to 60% of the members of the collective would similarly provide insufficient information to calculate their hours.  (*Id.* at 7-8.)  This further renders any single average of the hours worked to be unreliable if applied to the entire collective.  (*Id.* at 8.)

with a standard deviation of 6.4, and individual hours ranging from 44 to 70.5 hours per week. (*Id.* at 7.) Based on this distribution, he concluded that the computable hours for 95% of the collective are expected to fall within 41.6 to 66.7 hours per week. (*Id.*) Because of this wide range—over 25 hours—which was more than 50% of the base hours worked in the week, Dr. White determined that using a single average as a measure of hours worked is not representative of the testimony of the individual members of the collective. (*Id.*) For example, applying the weekly average, 54.1, to someone such as Adam Lambert, who testified that he worked on average 58.5 hours per week, would shortchange him by 114.4 overtime hours worked over 6 months, and by 228.8 hours over one year. (*Id.* at 8.) In contrast, applying the average to someone like Christopher Billingslea, whom Dr. White calculated to have worked on average 44 hours per week, would receive a windfall of 262.6 overtime hours over six months and over 525.5 hours over one year. (*Id.*)

The same is true for LAETs. Dr. White calculated their average hours per week to be 53.3 hours, with a standard deviation of 5.4, and a range of 44.5 to 62.25 hours per week. (*Id.* at 7) The computable hours for 95% of the collective are expected to fall within 42.8 to 63.9 hours per week. (*Id.*) Because the range of overtimes hours worked is 21.1, Dr. White again concluded that using a single average is not representative of the hours worked by individual LAETs. (*Id.*)

Plaintiffs have not offered any expert to rebut Dr. White's conclusions, and there is no evidence that would allow the calculation of the opt-in plaintiffs' hours worked without individual testimony. Should any collective member be entitled to compensation, the computation of his or her damages will, therefore, require individual testimony to determine the actual hours worked.

### E. Proceeding as a Collective Would Be Unmanageable and Would Not Provide Any Fairness or Procedural Benefits

In deciding whether to decertify an FLSA collective, a court must "consider whether proceeding as a collective would create fairness or procedural benefits." *Hundt*, 294 F.R.D. at

34

108.  Collective actions are "designed to promote judicial economy and to protect the interests of plaintiffs whose damages claims might be too small to justify the high costs of an individual lawsuit.  But those interests are not served where the need to address individualized factual issues cuts against any efficiency to be gained from collective treatment and makes the aggregation of claims unmanageable." *Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2013 U.S. Dist. LEXIS 176496, at *62 (N.D. Ill. Dec. 17, 2013).  As this Court has observed, "***[a] collective action is oxymoronic . . . where proof regarding each individual plaintiff is required to show liability***."  *Russell*, 721 F. Supp. 2d at 822 (emphasis added).  The same can be true where individualized proof is required to show damages.  *See, e.g.*,  *Espenscheid*, 705 F.3d at 776.

Here, there is no feasible way to reach a determination of whether the members of the collective are entitled to overtime compensation through supposedly "representative" proof at trial. Testimony from LAEs who spent the majority, if not all, of their time performing logistics services on behalf of their customers will not be representative of those LAEs who never landed a single customer and never performed any logistics services whatsoever, and vice versa.  So too for LAETs who regularly acted as full LAEs and had their own customers versus those who were strictly managed and limited in the duties they performed.  The need for individual proof on damages further renders proceeding to trial as a collective unwarranted.  Because any trial plan seeking to determine liability and/or damages on a class-wide basis would be unwieldy and fail to provide any fairness or procedural benefits, the LAE and LAE subclasses should be decertified.

## V.  CONCLUSION

For the foregoing reasons, TQL respectfully requests that the Court grant its motion to decertify both the LAE and LAET subclasses.

Respectfully submitted,

/s/ Gregory M. Utter

Gregory M. Utter (*admitted pro hac vice*)
Bryce J. Yoder (*admitted pro hac vice*)
Keating Muething & Klekamp, PLL
One E. Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6538

Matthew A. Bills
Barack Ferrazzano Kirschbaum & Nagelberg LLP
200 W. Madison St., Ste. 3900
Chicago, Illinois 60606
Tel: (312) 629-7493

*Attorneys for Defendant Total Quality Logistics*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served upon opposing counsel via the

Court's electronic docketing system this 17th day of August, 2018.

<u>/s/ Gregory M. Utter</u>
Gregory M. Utter

8545434.17

8019795.1