**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRIAN HUDGINS and JONATHAN RONDENO, on their own behalf and on behalf of those similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 16 C 7331** |
| **TOTAL QUALITY LOGISTICS, LLC,** | ) ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Brian Hudgins and Jonathan Rondeno sued Total Quality Logistics, LLC (TQL) on behalf of themselves and others similarly situated for violations of the Fair Labor Standards Act's (FLSA) overtime requirements. They alleged that TQL misclassified employees who served as logistics account executives—and trainees for that position—as exempt from FLSA's overtime pay requirement under that Act's administrative exemption. The plaintiffs moved to conditionally certify the case as a collective action, and this Court granted that motion. *See Hudgins v. Total Quality Logistics, LLC* (*Hudgins I*), No. 16 C 7331, 2016 WL 7426135 (N.D. Ill. Dec. 23, 2016). Counsel subsequently sent notices to potential class members, more than 140 of whom opted into the plaintiff collective, and the parties engaged in discovery. Based on that discovery, TQL now moves to decertify the collective action. For the reasons stated below, the Court denies the motion.

## Background

**A.    Factual background**

The following facts are undisputed except where otherwise noted.  TQL is a firm specializing in supply chain management and freight brokerage services. Headquartered in Cincinnati, Ohio and with offices in twenty-two states, it is among the largest such firms in the country.  TQL does not own trucks that move freight but rather acts as an agent connecting its customers to third-party carriers who transport customers' goods.  To accomplish this task, TQL maintains a sizable force of logistics account executives (LAEs) who cultivate and maintain relationships with customers. Aspiring LAEs must first spend several months as trainees before attaining the full privileges and duties of the role.

Brian Hudgins and Jonathan Rondeno are former LAEs.  Hudgins worked as a trainee and then an LAE in TQL's Chicago office from May 2014 to June 2015. Rondeno was a trainee and then an LAE in TQL's Orlando, Florida office from February to November 2015.  They allege that LAEs and trainees were required to work more than 40 hours per week.  They also allege that they were expected to be available twenty-four hours a day, seven days a week to respond to customers.  They never received overtime pay.  The plaintiffs allege that TQL misclassified them and every other LAE and trainee as exempt administrators under the FLSA.

The broad contours of the LAE and trainee positions are not disputed. Employees in both roles are paid a salary of $35,000 per year, and full LAEs are also eligible to earn commissions.  LAEs typically maintain their own books of business, meaning that they "prospect" for clients, then maintain those relationships.  The

services they sell include advising customers on which third-party carriers to use, negotiating prices with those carriers, assessing the applicability of relevant state and federal regulations, acting as a liaison between their customers and third-party shippers, and otherwise responding to customers' varying needs. Stated broadly, these duties appear quite standard to all LAEs. *See* Def.'s Opening Br., dkt. no. 182, at 5-10 (describing the common duties of the LAE role). Trainees perform a somewhat narrower subset of these same tasks, though the level of autonomy they are given varies because they are each assigned to an LAE who dictates the pace of their training.

Although there appears to be agreement, at least in broad terms, about what LAEs and trainees do, the parties disagree both on how widely day-to-day responsibilities vary between employees and on the importance of that variance. TQL asserts that, because each LAE must develop her own book of business, some less successful employees spend most or all of their time prospecting, while others spend most or all of their time providing logistics services. (Significant later, those who primarily provide logistics services allegedly exercise greater discretion than their counterparts who mostly prospected.) The plaintiffs, on the other hand, characterize all of the LAEs' and trainees' primary task as "sales." They emphasize that both prospecting and providing logistics services are part of a single sale and thus frame the variance among LAEs' daily activities as immaterial. To support this assertion, the plaintiffs point to standardized job listings and other record evidence that describes the LAE position as a sales job.

**B.     Procedural history**

Hudgins and Rondeno sued TQL in July 2016.  In September 2016, they moved to certify a collective action including two subclasses under the FLSA.  The first subclass would include all LAEs employed by TQL nationwide in the preceding three years, and the second would include trainees for the LAE position employed nationwide in the same timeframe.  They sought to exclude three groups:  (1) otherwise qualified LAEs who worked for TQL in Ohio, where a state-court collective action was already underway; (2) otherwise qualified LAEs who had already joined the Ohio action; and (3) any LAE who earned more than $100,000 per year for the entire three-year period.

The Court granted conditional certification of two subclasses.  *See Hudgins I*, 2016 WL 7426135, at *5.  The first subclass is made up of all LAEs meeting the qualifications noted above, and the second is made up of current and former trainees who worked during the three-year timeframe.  *Id.*  The Court directed TQL to provide the names, last known addresses, phone numbers, and e-mail addresses of putative class members to plaintiffs' counsel to facilitate reasonable notice by e-mail and first-class mail.  *Id.* at *6.  TQL did so, and notice was sent to putative members.

In the meantime, TQL argued that arbitration agreements signed by some of the putative class members precluded them from participating in the collective action.  The Court ordered briefing on the enforceability of those agreements and on the Court's authority to rule on their validity.  *See id.* at *7-8.  Ultimately, the Court held that the agreements were enforceable and removed from the class persons who had signed arbitration agreements.  *See Hudgins v. Total Quality Logistics, LLC* (*Hudgins II*), No. 16 C 7331, 2017 WL 5144191, at *4 (N.D. Ill. Feb. 8, 2017).   That group included

4

named plaintiff Rondeno. TQL subsequently supplemented its list of class members that had signed arbitration agreements, knocking out two more members of the class. *See Hudgins v. Total Quality Logistics, LLC* (*Hudgins III*), No. 16 C 7331, 2018 WL 1706368, at *3 (N.D. Ill. Apr. 9, 2018).

Although the collective group has gone through several expansions and contractions, it currently includes 142 LAE and trainee members. TQL now moves to decertify both subclasses of the collective, arguing that they are subject to insufficiently common questions of law and fact to support a collective action under the FLSA.

## Discussion

The FLSA requires an employer to pay an employee for the time she works beyond forty hours in one week at one and one-half times the employee's regular pay rate. 29 U.S.C. § 207(a)(1). The statute also authorizes "any one or more employees for and on behalf of himself or themselves and other employees similarly situated" to sue in a collective action to recover unpaid overtime wages. *Id.* § 216(b). "[D]istrict court[s] ha[ve] wide discretion to manage collective actions" under this provision. *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010); *see also Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989) (discussing district courts' "discretion" and "responsibility" to manage "joinder of additional parties to assure that [FLSA collective action] is accomplished in an efficient and proper way").

Courts in this district and circuit commonly assess the viability of collective action under the FLSA in two stages. *See Russell v. Ill. Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010) (Kennelly, J.). At the first stage, "plaintiffs only need to make a minimal showing that others in the potential class were similarly situated." *Id.* (internal

5

quotation marks omitted). The Court previously ruled that the plaintiffs satisfied this requirement when it granted conditional certification. *See Hudgins I*, 2016 WL 7426135, at *5.

After conducting significant discovery, TQL triggered second-stage review by moving to decertify the collective action. At this second stage, "the court's inquiry is more stringent"; it must assess whether the plaintiffs have presented sufficient evidence of "an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws" such that they are "similarly situated" for the purposes of the collective action. *Russell*, 721 F. Supp. 2d at 811. Although the FLSA does not define "similarly situated," the parties structure their arguments around a common formulation that involves three factors: (1) the extent to which plaintiffs share common "factual and employment settings"; (2) any defenses that are applicable to only some individual plaintiffs; and (3) "fairness and procedural considerations." *Id.* (quoting *Thiessen v. Gen. Elec. Capital Co.*, 267 F.3d 1095, 1103 (10th Cir. 2001)).

The crux of the present dispute involves the application of the FLSA's "administrative exemption" for overtime pay to LAEs and trainees. Specifically, section 213 provides that overtime pay requirements "shall not apply with respect to . . . any employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). TQL argues that neither the LAE subclass nor the trainee subclass should remain certified. It first asserts that members of the subclasses do not share sufficiently common employment or factual settings because differences in performance resulted in different day-to-day duties. It argues that those differences resulted in some members of the collective clearly qualifying for the administrative exemption while others may not.

6

TQL further argues that determining whether any given class member qualifies will require extensive individualized factual analysis.  It makes similar arguments regarding damages.  TQL contends that determining the wages to which each individual plaintiff is owed will require individualized proof, rendering a collective action inappropriate.

The Court will assess the parties' arguments regarding each of the subclasses in turn and will then discuss TQL's damages arguments.

**A.    LAE subclass**

**1.    Common factual and employment circumstances**

In assessing whether plaintiffs are similarly situated, the Court first considers "similarities and differences in the employment and other factual settings of the various plaintiffs, including whether plaintiffs had differing job titles or assignments, worked in different locations, were under different supervisors or decisionmakers, or allege different types of violative conduct." *Vennet v. Am. Intercontinental Univ. Online*, No. 05 C 4889, 2005 WL 6215171, at *7 (N.D. Ill. Dec. 22, 2005).

TQL argues that the members of the LAE subclass are not similarly situated because individual class members' day-to-day duties varied from one another.  That variance is significant, TQL asserts, because it bears on whether the administration exemption will apply to various members of the group.  Specifically, it argues that LAEs who developed robust books of business (and therefore spent little or no time prospecting for new customers) spent most of their time performing logistics services, advising clients, and otherwise exercising enough discretion related to the general business operations of the company to satisfy the exemption's requirements.  TQL also argues that some members of the collective may even have exercised supervisory

power, further buttressing their eligibility for the exemption. And it asserts that these issues are not subject to the sort of common proof well-suited to collective adjudication and that the Court should thus grant decertification.

The plaintiffs counter that the "primary duties" of LAEs and trainees were perfectly uniform: they all made sales. Therefore, in the plaintiffs' view, the entire collective is sufficiently similarly situated to support continued certification. They point to substantial evidence that TQL paid all LAEs at the same base rate, presented the LAE position to prospective employees as a sales job, and had several internal policies that described it as a sales position. Plaintiffs also point to TQL's own decision to categorically exempt all LAEs from overtime as evidence that they are similarly situated. They contend that it would be incongruous to allow TQL to treat LAEs collectively for the purpose of avoiding payment of overtime but not for the purpose of requiring payment of illegally withheld wages.

But, although conceivably related to the question of whether members of the collective share common factual or employment settings, the application of the administrative exemption fits better under the individualized defenses element of the applicable test. Thus rather than assessing the administrative exemption here, the Court will address those arguments below.

Still, the Court must determine whether the members of the LAE subclass share sufficiently common employment circumstances. Based on the record, the Court is satisfied that the LAE subclass's claims satisfy this element. Specifically, the plaintiffs have presented evidence that members of the subclass shared a common title, job description, and basic responsibilities. Likewise, they allegedly suffered a common

harm stemming from TQL's policy of classifying all LAEs as overtime exempt.  To the extent members of the subclass varied in employment and factual circumstances, it appears that this can be attributed to individual LAEs' excelling at the common responsibilities of their position, with the most successful employees spending more of their time doing certain parts of the job than their less successful peers.

It is also probative that the entire LAE subclass was categorically classified as exempt from overtime pay by TQL.  That policy suggests that company itself viewed the LAEs as similarly situated for the purposes of overtime pay.  And, unlike in *Russell*, where this Court decertified certain extraneous claims, *see Russell*, 721 F. Supp. 2d at 814, all of the claims brought by the plaintiffs in this case concern that single policy. *See also Vennet*, 2005 WL 6215171, at *7.

This is not to suggest that there are no differences among members of the LAE subclass.  But some variances in individual employees' performance of responsibilities common to their positions are inevitable and insufficient to call for decertification.  *See Russell*, 721 F. Supp. 2d 804, 812 ("Although certification requires a factual nexus, plaintiffs in a FLSA collective action need not be situated identically."); *see also O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009) (finding plaintiffs sufficiently similarly situated "because their claims were unified by common theories of defendants' statutory violations" even though "proofs of those theories are inevitably individualized and distinct").  The Court therefore concludes that plaintiffs have satisfied their burden under the first factor.

## 2.    Individualized defenses

Next, the Court considers TQL's contention that individual plaintiffs are subject to

unique defenses not common to the class. "[T]he availability of defenses to some but not all of the putative class members . . . poses significant case management concerns." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 954 n.8 (11th Cir. 2007) (internal quotation marks and citation omitted). But courts have also noted that "[i]f one zooms in close enough on anything, differences will abound; even for a single employee doing a single job." *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-1018, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007); *see also Russell*, 721 F. Supp. 2d at 820.

TQL asserts two arguments that concern this factor. First, it argues that the administrative exemption to FLSA's overtime requirements may apply to some LAE subclass members and not others. Then it argues that a handful of specific named members of the subclass are subject to yet other unique defenses. In assessing these defenses, the Court does not determine their merits but rather focuses on whether they are likely to be applicable to the subclass as a whole.

### a.    Administrative exemption

TQL argues that the FLSA's administrative exemption, *see* 29 U.S.C. § 213(a)(1), applies to at least some of the LAE subclass members and that determining to whom it applies will be an individualized, fact-bound endeavor ill-suited for collective resolution. The Department of Labor has promulgated regulations interpreting the exemption. *See* 29 C.F.R. § 541.200-203. Under the relevant regulation, "the term 'employee employed in a bona fide administrative capacity'" means any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board,

lodging or other facilities[1];
(2) Whose primary duty is the performance of office or non-manual work
directly related to the management or general business operations of the
employer or the employer's customers; and
(3) Whose primary duty includes the exercise of discretion and
independent judgment with respect to matters of significance.

*Id.* § 541.200(a). The "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* § 541.700(a). TQL will ultimately have to prove that the plaintiffs satisfied every element of the regulation to prevail. *See Hundt. v. DirectSat USA, LLC*, 294 F.R.D. 101, 110 (N.D. Ill. 2013).

The first requirement of the regulation is undisputed. TQL argues, however, that the second and third elements require the Court to determine each employee's "primary duty" on an individual basis. The plaintiffs argue that no such individualized inquiry is necessary because all the subclass members shared work duties sufficient for their claims to be resolved collectively.

i. **"Related to management or general business operations"**

The regulation provides a helpful gloss on what it means for an employee's "primary duty" to be "related to management or general business operations." 29 C.F.R. § 541.201. "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a). The Seventh Circuit has explained that

---

[1] The minimum compensation level was changed by regulation in 2016, but that regulation was enjoined by a district court after this case was filed. *See Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 534 (E.D. Tex. 2016). In any case, the parties do not dispute that the plaintiffs satisfy the first element.

under this regulation "when an employee is engaged in the core function of a business, his or her task is not properly categorized as administrative." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012). "'Servicing' a business . . . denotes employment activity ancillary to an employer's principal production activity . . . ." *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1072 (7th Cir. 1997) (quoting *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 904-05 (3d Cir. 1991)), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

The plaintiffs contend that they were misclassified because TQL's core business is selling logistics services to its clients and the primary duty of LAEs is to make those sales. Noting that LAEs are three quarters of all TQL's employees, the company advertises the LAE position as a sales job, and several departments exist to support LAEs' work, the plaintiffs further argue that their duties could not properly be characterized as "ancillary to" TQL's principal business. TQL counters that each LAE may have a different primary duty depending on her day-to-day activities. Some successful LAEs, it argues, will have the primary duty of "logistics," but others who spend more of their time scrounging for business may have "sales" or "prospecting" as a primary duty. In TQL's view, an employee whose primary duty was "logistics" would serve in an advisory role that would easily qualify for exemption under the regulation. *See Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 980-81 (7th Cir. 2011) (noting that advisory duties often satisfy the standard).

Accepting for the sake of argument that an employee whose primary duty was "logistics" would qualify under the second factor from 29 C.F.R. § 541.200, TQL's contention nevertheless fails. The Court addresses here not the strength of TQL's

defenses but rather their uniformity across the collective group. As TQL acknowledges, the Seventh Circuit has rejected the proposition that the allocation of an employee's time controls the determination of her "primary duty" for the purposes of the administrative exemption. *See Demos v. City of Indianapolis*, 302 F.3d 698, 704-05 (7th Cir. 2002). The Court may, for instance, consider factors including "the relative importance" of an employee's various duties "to [her] employer." *Id.* It is enough to observe that the primary duty of the LAEs in the plaintiff class is unlikely to depend only or even primarily on factual questions of how much time each individual LAE spent on particular tasks. Without determining at this point *what* the LAEs' primary duty was or is, it appears that a class-wide resolution is possible under the second element of the administrative-exemption regulation.

The Court is also persuaded that TQL's decision to categorically exempt all LAEs is probative. Despite TQL's efforts to cast this point as immaterial, such a "uniform exemption policy is certainly relevant" in determining whether an exemption defense would be individualized and thus undermine the effectiveness of collective action. *See Dailey v. Groupon, Inc.*, No. 11 C 05685, 2014 WL 4379232, at *5 (N.D. Ill. Aug. 27, 2014); *cf. In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) ("An internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees.").

To reiterate, the Court does not express an opinion on the relative strength or weakness of TQL's defense with respect of the second regulatory element of the administrative exemption. Instead, it concludes only that that defense is susceptible to

13

collective resolution.

### ii. "Discretion or independent judgment"

TQL also argues individualized inquiries will be necessary under the third and final element of the Department of Labor regulation. Again, a lengthy regulation provides color and examples from which to glean the provision's meaning. *See* 29 C.F.R. § 541.202. In part, it says that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* § 541.202(a). TQL will ultimately need to demonstrate that this regulatory factor is satisfied to defeat the plaintiffs' claims that it misclassified them as exempt.

TQL's arguments sound familiar notes. It asserts that some LAEs (the more successful ones) did primarily discretionary logistical work, while others spent their days unsuccessfully cold calling prospective clients. And, as above, TQL argues that these differences will result in disparate determinations of individual LAEs' primary duties for the purposes of the exemption.

Without determining the relative strength of the defense, the Court concludes that TQL's argument lacks merit. A wide range of self-paced jobs—many arguably more circumscribed than even the most limited version of the LAE position—have been held to involve sufficient discretion and independent judgment to satisfy this requirement. *See, e.g.*, *Schaefer-LaRose*, 679 F.3d at 577-83 (discussing the standard's application in several contexts). For instance, in *Schaefer-LaRose*, the Seventh Circuit held that, despite working within tightly controlled messaging guidelines, a pharmaceutical sales representative exercised sufficient discretion because her work was not scripted. *Id.* at

14

565-66.  That is, because she could tailor each pitch to her audience, the representative exercised enough discretion to satisfy the regulation.  *Id.* at 583.  Because the parties agree that LAEs had freedom to determine which prospective customers to call and how to pitch TQL's logistic services, it is not all that clear that the degree of discretion exercised by LAEs is likely to be contested, let alone that any dispute on this point is likely to be terribly significant in the overall analysis.

Moreover, even if prospecting involved insufficient discretion to satisfy the regulation, whether any given LAE's primary duty was prospecting is not determined simply be calculating what portion of her time she spent on it.  *See Demos*, 302 F.3d at 704-05.  Rather, the Court considers, other things, "the relative importance of [an employee's] duties to the employer."  *Id.*  TQL categorically designated *all* of the LAEs exempt, regardless of how much time they spent on the phone attempting to drum up business.  There is a fair argument that TQL would not have uniformly classified the LAES if it believed that time spent on prospecting could change their primary duties and create individualized questions about the exemption's applicability.  Under the reasoning of *Demos*, this common classification decision suggests that the question can be resolved based on collective evidence.

The Court concludes, without determining the strength of the defense or what exactly the LAEs' primary duties were, that the third regulatory factor's application to the LAE subclass is susceptible to collective resolution.  Under the FLSA, the plaintiffs need not be identically situated to proceed collectively, so long as they are situated similarly enough for collective resolution to be possible.  *Russel*, 721 F. Supp. 2d at 812.  This factor therefore provides no basis for decertification.

15

### b.    Other defenses

TQL identifies three other relatively minor defenses it says are unique to specific members of the LAE subclass.  First, TQL argues that subclass members Justin Baker and Desiree Rogers are subject to unique statute of limitations defenses.  The plaintiffs do not deny the statute of limitations problem and purport to "agree to dismiss these class members."  Pl.'s Resp. Br., dkt. no 197, at 24.  But the plaintiffs have not filed a formal notice of dismissal regarding these two plaintiffs.  If plaintiffs mean what they say, they should file such a notice immediately.  If and when they do so, this defense will no longer present any obstacle to continued collective litigation.

Second, TQL argues that subclass member Jonathan Tweed is subject to a unique defense because of his military service.  Specifically, it argues that Tweed was away for periods of his employment as an LAE and that his claim will therefore be subject to unique, individualized proof.  This, however, bears only upon the amount Tweed would be entitled to recover if plaintiffs prevail.  Were this sort of difference sufficient to require decertification, it would undermine FLSA's collective action provision.  *See Alvarez*, 605 F.3d at 450; *Frank*, 2007 WL 2780504, at *4.  The Court rejects this as a basis for decertification.

Third, TQL asserts in conclusory terms that subclass member Michael Pearce is "potentially" subject to the unique defense that he was exempt from overtime compensation as a highly compensated worker.  *See* Def.'s Opening Br., dkt. no 182, at 26; 29 C.F.R. § 541.601.  It bases this argument on evidence that Pearce made $55,716.80 in the first twenty-five weeks of 2014, which TQL says put him on pace to make nearly $116,000 had he worked through the year.  The Court concludes, without

assessing the strength of this defense, that it insufficient to support decertification.  The record indicates that Pearce worked at TQL before 2014 and that he was compensated at the rate described above only for his final six months on the job.  Even beyond the fact that TQL has not yet met its burden to prove that the exemption applies, *see Schaefer-LaRose*, 679 F.3d at 572, it has not demonstrated that Pearce's work before 2014 falls within the highly compensated worker exemption.  Because of this shortfall, the Court concludes that even if TQL does eventually prove that the exemption applies to Pearce's 2014 earnings, that determination will bear only on Pearce's damages and not on collective liability.

In sum, each of TQL's arguments based on purportedly individualized defenses fails.  Even so, the Court reserves the right to revisit this conclusion as the record in this case develops.  *Cf. Alvarez*, 605 F.3d at 449 ("A district court has wide discretion to manage collective actions.").

### 3.    Fairness and procedural considerations

The third set of factors the Court assesses in evaluating the motion for decertification are fairness and procedural considerations.  The Court must "consider whether proceeding as a collective would create fairness or procedural benefits." *Hundt*, 294 F.R.D. at 108.  "The collective action device is designed to promote judicial economy and to protect the interests of plaintiffs whose damages claims might be too small to justify the high costs of an individual lawsuit."  *Blakes v. Ill. Bell Tel. Co.*, No. 11 C 336, 2013 WL 6662831, at *16 (N.D. Ill. Dec. 17, 2013); *see also Hoffmann-La Roche*, 493 U.S. at 171 (emphasizing the importance of efficiency).  The Seventh Circuit has indicated that district courts must take this mandate seriously, "sifting

through the subclaims of each of the myriad plaintiffs" as necessary to ensure fairness. *Alvarez*, 605 F.3d at 450.

Considerations of efficiency and fairness disfavor decertification.  The collective group is made up of about 140 individuals, all of whom served in the same position with the same company and had the same basic responsibilities—including a minimum required schedule exceeding forty hours per week—and all of whom were subject to a categorical overtime exemption decision by TQL.  Because TQL's liability and defenses are subject to collective resolution, there is no need for the sort of inefficient "detailed fact-specific inquiry" that this standard is intended to guard against.  *Id.* at 449.  Nor, as discussed below, do TQL's arguments about damages warrant decertification.  The Court concludes that it is preferable as a matter of fairness and judicial economy to continue a single collective action rather than sending 140 litigants out to file individual lawsuits.  *Cf. Allen v. City of Chicago*, No. 10 C 3183, 2014 WL 5461856, at *8 ("[J]udicial economy would be better served by a collective action of fifty-three opt-in plaintiffs than by fifty-three individual trials.").

**B.      Trainee subclass**

The trainee subclass is subject to much of the same analysis as the LAE subclass.  For instance, common basic responsibilities and collective classification as overtime exempt again suggest that common factual and employment circumstances predominate.  Likewise, fairness and procedural considerations apply to this subclass much as they did for the LAEs.  Because the majority of the analysis mirrors that already discussed above, the Court focuses on two potential differences.

Specifically, without deciding the merits of the defense, the Court notes that the

administrative exemption's regulatory factors may apply somewhat differently to the trainee subclass. First, the second factor—whether an employee's "primary duty" is "related to management or general business operations"—may apply differently to trainees because their primary duty is conceivably different from that of LAEs. The trainees are, after all, training to become LAEs, and their primary duty may turn out to be something akin to "training" rather than "sales" or "logistics." But this is no obstacle; for the same reasons discussed above, the trainee subclass members' primary duty for the purposes of applying the second regulatory factor appears amenable to collective resolution.

The other potential difference relates to the third regulatory factor—whether the trainees' "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). TQL argues that some of the trainees may have exercised insufficient discretion to qualify for the exemption while others likely cleared the threshold. It points out that some trainees worked as de facto LAEs during their training periods, while others were subject to micromanagement by the LAEs assigned to train them. TQL asserts that determining whether a given trainee exercised sufficient discretion will require individualized evidence. The plaintiffs do not address this factor directly on this motion but mention in their subsequent motion for summary judgment that they think the trainees as a class exercised insufficient discretion to qualify for the exemption.

Ultimately, this question too appears subject to collective resolution. Again, since the time each trainee spent a given task is not determinative of her primary duty within the meaning of the statute, other considerations common to the subclass may be

19

decisive. *See Demos*, 302 F.3d at 704-05. Furthermore, a key consideration in whether an employee is eligible for exemption under this factor is the extent to which she is subject to stringent "oversight and control." *Blanchar v. Std. Ins. Co.*, 736 F.3d 753, 758 (7th Cir. 2013); *see also* 29 C.F.R. 541.202(c). Even accepting TQL's contention that trainees enjoyed disparate degrees of freedom in their work, the key here is that any freedom a trainee did enjoy was itself entirely at the discretion of the LAE training her. *See* 29 C.F.R. § 541.202(c) ("The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision."). Put another way, the record suggests that the variance in trainees' day-to-day work was itself a product of their subjection to their trainers' control.

Without assessing the strength of TQL's defense under this factor, the Court concludes that resolution of common questions regarding supervision and control are likely to be decisive. Application of the third regulatory factor therefore appears amenable to collective resolution and thus does not require decertification.

## C.  Damages issues

Finally, TQL argues that differences in the number of overtime hours worked by various members of the collective will require fact-specific determinations of damages, undermining the effectiveness of collective action. It cites *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013), for the proposition that "inability to demonstrate damages on a class-wide basis through representative evidence can be grounds for decertification." Def.'s Opening Br., dkt no. 182, at 30. TQL retained an expert, Paul White, to assess the depositions of members of the collective group to

determine whether collective resolution of damages was possible. White opined that the hours worked by members of the collective varied so widely that they would require individual evidence to calculate.

The plaintiffs emphasize that liability is subject to collective resolution because all members of the class worked in positions for which the baseline schedule required them to work in excess of forty hours per week and are subject to the same exemption defense, leaving only questions about to how much each plaintiff is entitled to recover. And they argue that courts, including this Court, have held that such "variations in damages . . . do not warrant decertification." *Russell*, 721 F. Supp. 2d at 820-21 (internal quotation marks and alterations omitted). The plaintiffs also disagree that collective evidence is insufficient, urging the Court to allow representative testimony to determine damages. They attack TQL's expert's testimony as unreliable in light of the incompleteness of the records he assessed. Alternatively, the plaintiffs suggest that decertification is either premature at this stage or that the Court should exercise its case management discretion to bifurcate questions of liability and damages. *See Hoffmann-La Roche*, 493 U.S. at 171 (acknowledging the broad discretion of district courts to take such efficiency arguments into consideration).

The Court concludes that any individualized damages determinations necessary in this case do not require decertification. Even accepting the accuracy of White's determination that damages probably are not amenable to collective resolution, it appears that, once collective liability issues are resolved, "calculation of each plaintiff's award (if any) will be largely mechanical." *Alvarez*, 605 F.3d at 450. And, contrary to TQL's characterization, *Espenscheid* supports this outcome. In that case, the Seventh

21

Circuit held that "the district court must carefully explore the possible ways of overcoming problems in calculating individual damages" before concluding that collective action is not viable. *Id.* at 776. It upheld a district court's decision to decertify a class of more than 2300 plaintiffs over damages issues because the plaintiffs "opposed bifurcation and subclasses and refus[ed] to suggest a feasible alternative." *Espenscheid*, 705 F.3d at 775-76. As the court emphasized, "if class counsel is incapable of proposing a feasible litigation plan though asked to do so, the judge's duty is at an end. And that's what happened" in *Espenscheid*. *Id.*

Not so here. The plaintiff collective has already been divided into subclasses to facilitate collective resolution. And, even though the collective here is far smaller and more homogenous than the one involved in *Espenscheid*, the plaintiffs have proactively proposed alternative accommodations for damages calculations, if necessary, including bifurcation of the damages question from the issue of liability.

It is not necessary or appropriate, for present purposes, to determine whether bifurcation of the issue of damages will ultimately be needed. For now, it is enough to observe that the damages issues raised by TQL are insufficient to warrant wholesale decertification. *See Espenscheid*, 705 F.3d at 776.

### Conclusion

For the foregoing reasons, the Court denies the defendant's motion to decertify the plaintiff collective [dkt. no. 182].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 29, 2019