# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BRIAN HUDGINS, individually and on behalf of those similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| TOTAL QUALITY LOGISTICS, LLC, | ) ) |
| Defendant. | ) ) |

Case No. 16 C 7331

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Brian Hudgins sued Total Quality Logistics, LLC (TQL) on behalf of himself and a class of others similarly situated for violations of the Fair Labor Standards Act's (FLSA) overtime requirements. They allege that TQL misclassifies employees who served as logistics account executives—and trainees for that position—as exempt from overtime pay requirements under the FLSA's administrative exemption. The Court certified an FLSA collective action, and notice was sent to potential class members, more than 140 of whom opted in. The Court denied TQL's subsequent motion to decertify the class.

The plaintiffs have moved for summary judgment on the application of the FLSA's administrative exemption to logistics account executives (LAEs) and trainees for that role.[1] For the reasons stated below, the Court denies the motion.

---

[1] The Court addresses LAEs and trainees together in this opinion because the parties did so in their briefs. This is not meant to suggest that the evidence definitively

## Background

**A. Factual background**

The following facts are undisputed except where otherwise noted. Headquartered in Cincinnati, Ohio and with offices in twenty-two states, TQL is one of the largest freight brokerage firms in the country. TQL does not own trucks that move freight but rather acts as an agent connecting its customers to third-party carriers who transport customers' goods. To accomplish this task, TQL maintains a sizable force of logistics account executives (LAEs) and trainees—around three quarters of the company's total workforce—who cultivate and maintain relationships with customers. Aspiring LAEs must first spend several months as trainees before attaining the full privileges and duties of the role.

Brian Hudgins is a former LAE. He worked as a trainee and then an LAE in TQL's Chicago office from May 2014 to June 2015. Hudgins alleges that LAEs and trainees were required to work more than 40 hours per week and were expected to be available twenty-four hours per day, seven days per week to respond to customers. But they never received overtime compensation. Hudgins alleges that TQL misclassified him and every other LAE and trainee as categorically exempt from overtime compensation under the FLSA in order to avoid paying them the wages they are owed.

The broad contours of the LAE and trainee positions are not disputed. Employees in both roles are paid a salary of $35,000 per year, and full LAEs are also eligible to earn commissions. LAEs typically maintain their own books of business, meaning that they "prospect" for clients, then maintain those relationships. The

---

establishes that the LAE and trainee roles are wholly equivalent for present or later purposes. The Court has made no finding one way or the other on that issue.

services LAEs sell to customers include advising customers on which third-party carriers to use, negotiating prices with those carriers, assessing the applicability of relevant state and federal regulations, acting as a liaison between their customers and third-party shippers, and otherwise responding to customers' varying needs. Trainees perform a somewhat narrower subset of these same tasks, though the degree of latitude they are given may vary to some extent because each trainee is assigned to an LAE who is in control of the pace of training.

Although there appears to be agreement, at least in broad terms, about what LAEs and trainees do, the parties disagree forcefully about what duties lie at the core of these roles. As discussed below, this disagreement proves important to the question of whether the FLSA's administrative exemption can properly be applied to the LAEs and trainees. TQL asserts that the LAEs and trainees are essentially advisors for the company's clients, providing logistics consultations and recommendations on a wide variety of issues. It emphasizes that individuals in these roles act with significant autonomy and serve as the single contact point between TQL and the clients with whom they work. The plaintiffs, on the other hand, characterize all of the LAEs' and trainees' primary task as "sales." They contend that both prospecting for new clients and providing logistics services are part of a single sales process and thus frame the roles' primary duty as simply that of selling logistics services. To support this assertion, the plaintiffs point to standardized job listings and other record evidence characterizing the LAE position as a sales job.

**B.  Procedural history**

Hudgins sued TQL in July 2016. In September 2016, he moved to certify a

3

collective action comprising two subclasses under the FLSA. The first subclass would include all LAEs employed by TQL nationwide in the preceding three years, and the second would include trainees for the LAE position employed nationwide in the same timeframe. Hudgins sought to exclude three groups: (1) otherwise qualified LAEs who worked for TQL in Ohio, where a state-court collective action was already underway; (2) otherwise qualified LAEs who had already joined the Ohio action; and (3) any LAE who earned more than $100,000 per year for the entire three-year period. The Court granted conditional certification. *Hudgins v. Total Quality Logistics, LLC* (*Hudgins I*), No. 16 C 7331, 2016 WL 7426135, at *8 (N.D. Ill. Dec. 23, 2016). The parties then collaborated to send notice to members of the putative class.

In the meantime, TQL argued that arbitration agreements signed by some of the putative class members barred collective action. The Court ordered briefing on the enforceability of those agreements and on the Court's authority to rule on validity. Ultimately, the Court held that the agreements were enforceable and decertified the members of the class who had signed arbitration agreements. *See Hudgins v. Total Quality Logistics, LLC* (*Hudgins II*), No. 16 C 7331, 2017 WL 514191, at *4 (N.D. Ill. Feb. 8, 2017). TQL subsequently supplemented its list of class members who had signed arbitration agreements, knocking out two more members of the class. *See Hudgins v. Total Quality Logistics, LLC* (*Hudgins III*), No. 16 C 7331, 2018 WL 1706368, at *3 (N.D. Ill. Apr. 9, 2018).

In August 2018, TQL moved to decertify the collective and both subclasses, arguing that members' claims had insufficient common questions of law and fact to support collective action under the FLSA. The Court denied that motion, concluding

that common factual and employment circumstances predominated sufficiently to render the suit amenable to collective resolution. *See Hudgins v. Total Quality Logistics, LLC* (*Hudgins IV*), No. 16 C 7331, 2019 WL 354958, at *4-10 (N.D. Ill. Jan. 29, 2019). The Court noted, however, that two additional members of the plaintiff collective were subject to unique statute of limitations defenses and therefore removed them from the class. *See id.* at *7; dkt. no. 202 (voluntarily removing these two plaintiffs).

The plaintiffs have moved for summary judgment regarding the applicability of the FLSA's administrative exemption to LAEs and trainees.

**Discussion**

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018). The Court views the evidence and draws all reasonable inferences in favor of the non-moving party. *See Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019). To survive summary judgment, the non-movant must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

**A.    Legal context**

The FLSA requires an employer to pay an employee for the time she works beyond forty hours in one week at one and one-half times her regular pay rate. 29 U.S.C. § 207(1). The crux of the present dispute is the application of the FLSA's "administrative exemption" for overtime pay to LAEs and trainees. Section 213 of the FLSA provides that overtime pay requirements "shall not apply with respect to . . . any

5

employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). The Department of Labor has promulgated regulations interpreting this statute. See 29 C.F.R. §§ 541.200-203. According to the relevant regulation, "the term 'employee employed in a bona fide administrative capacity'" means any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

Id. § 541.200(a).[2]

A plaintiff who moves for summary judgment on claims on which she ultimately bears the burden of proof typically faces an uphill battle. See Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund, 778 F.3d 593, 601 (7th Cir. 2015). But in this case, plaintiffs are seeking summary judgment on what amounts to an affirmative defense, as the FLSA places "the burden . . . on the employer to establish that an employee is covered by a FLSA exemption." Blanchar v. Standard Ins. Co., 736 F.3d 753, 756 (7th Cir. 2013) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974)). Plaintiffs therefore occupy a position more familiar to defendants in civil suits. They argue that TQL lacks evidence that would permit a reasonable jury to make a finding in its favor on one of the necessary elements of the administrative exemption and that as a

---

[2] The language of section 541.200(a)(1) was enjoined by a district court after the present case was filed. See Nevada v. U.S. Dep't of Labor, 218 F. Supp. 3d 520, 534 (E.D. Tex. 2016). This change is immaterial here, however, as the parties do not dispute that the plaintiffs would satisfy the first requirement whether or not it were enforceable.

6

result they are entitled to summary judgment that the exemption does not apply. Specifically, the plaintiffs zero in on the second requirement for the exemption—an employee's primary duty must be directly related to administrative tasks—and contend that TQL cannot satisfy its burden.

The Department of Labor regulation provides context for what is required for an employee's "primary duty" to qualify as "directly related to . . . management or general business operations."

> The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 500.201(a). Examples of qualifying work include "quality control," "procurement," and "legal and regulatory compliance," *id.* § 500.201(b), and an employee may qualify even if her "primary duty is the performance of work directly related to the management or general business operations of the employer's customers" rather than that of the employer itself, *id.* § 500.201(c). The Seventh Circuit has described this regulation as creating a dichotomy between "production" and "sales" duties, on one hand, and "administration" duties on the other. *See, e.g., Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008).

In *Schaefer-LaRose*, the Seventh Circuit suggested that the "directly related to" language also itself bears legal significance in some contexts. There, in assessing whether traveling sales representatives for a pharmaceutical company were eligible for the administrative exemption, the court suggested that "when an employee is engaged

in the core function of a business, his or her task is not properly categorized as administrative." *Schaefer-LaRose*, 679 F.3d at 574. That is, at least for an employer whose principal function is producing or selling things, an employee's primary duty must be ancillary to that function to satisfy the requirement. *See id.* Applying this standard, the court in *Schaefer-LaRose* found that pharmaceutical sales representatives were eligible for the administrative exemption because "the core function of the drug makers is the development and production of pharmaceutical products" and the representatives' "work supports that function, but is distinct from it." *Id.*; *see also Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1072 (7th Cir. 1997), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 968 n.1 (7th Cir. 2013).

The Department of Labor's regulation also explains how to assess an employee's primary duty.

> The term "primary duty" means the principal, main, major or most important duty that the employee performs. . . . Factors to consider when determining the primary duty of an employee include, but are not limited to, [1] the relative importance of the exempt duties as compared with other types of duties; [2] the amount of time spent performing exempt work; [3] the employee's relative freedom from direct supervision; and [4] the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700. Assessing an employee's primary duty "requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose*, 679 F.3d at 572. This "[d]etermination . . . must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). It is perhaps unsurprising, then, that "numerous courts have found 'this intensive factbased inquiry is inappropriate for summary judgment.'" *Tamas v. Family Video Movie Club, Inc.*, No 11 C 1024, 2013 WL 1286693, at *5 (N.D.

8

Ill. Mar. 28, 2013) (quoting *Ely v. Dolgencorp, LLC*, 827 F. Supp. 2d 872, 886 (E.D. Ark. 2011)). It is with this context in mind that the Court considers whether TQL has pointed to sufficient evidence to withstand summary judgment.

**B.     Application**

The plaintiffs contend that TQL has failed to point to evidence from which a reasonable jury could find that LAEs' and trainees' "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a). In support of their position, the plaintiffs cite evidence that TQL itself regards LAEs and trainees primarily as salespeople, including job postings and an introductory video posted by the company's YouTube account.[3] They emphasize that LAEs and trainees generate most of TQL's revenues by selling logistics services and that the company's other departments generally exist to support the LAEs and trainees in their work. In plaintiffs' view, this makes it clear that the LAE and trainee roles' primary duties are to "engage[ ] in the core function of the business"—sales of logistics services—and that under Seventh Circuit precedent they therefore are "not properly categorized as administrative." *Schaefer-LaRose*, 679 F.3d at 574.

TQL, on the other hand, contends that undisputed evidence establishes that LAEs and trainees do precisely the sorts of work identified by the regulation as administrative. It cites extensive deposition testimony that both roles involve, among other things, advising customers on "quality control," "procurement," and "legal and

---

[3] The parties dispute whether the video is admissible without further authentication. Because this question is immaterial to the outcome of the present motion, the Court need not address it.

9

regulatory compliance"[4]—categories of work expressly identified by the regulation as qualifying for the exemption, see 29 C.F.R. § 500.201(b). And TQL notes that it does not matter, under the regulation, whether the LAEs and trainees provide these services to TQL itself or to its customers; either will suffice. See id. § 500.201(c). It further emphasizes that LAEs and trainees undisputedly serve as the sole points of contact between TQL and its clients—a fact that the Seventh Circuit has acknowledged is a factor in this analysis. See, e.g., Haywood, 121 F.3d at 1072 (describing service as a sole representative as a "classic administrative function").

TQL also disputes the plaintiffs' characterization of Schaefer-LaRose. Citing the Seventh Circuit's earlier opinion in Roe-Midgett, 512 F.3d at 865, TQL contends that Schaefer-LaRose should not be read so broadly as to disallow the administrative exemption for any employee engaged in the "core function" of a business but rather should be limited to businesses whose core functions are producing or selling things. TQL points out that in Roe-Midgett the Seventh Circuit found that insurance claims adjustors qualified for the administrative exemption even though they were apparently engaged in the core function of the business, an insurance company. See Roe-Midgett, 512 F.3d at 872-73.

The Court concludes that plaintiffs' motion rests on genuine disputes of material fact regarding the primary duties of the LAE and trainee roles and how they relate to TQL's core function(s) and that summary judgment is therefore inappropriate. As the Seventh Circuit observed in Schaefer-LaRose, claims like this one "require[ ] a

---

[4] TQL also lists "negotiating" as a relevant task, though that term does not appear in the regulation's list of examples. See 29 C.F.R. § 541.201(b).

10

thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose*, 679 F.3d at 572. The parties offer competing interpretations of reams of record evidence including internal TQL documents and job postings, voluminous deposition testimony, and other materials. If the plaintiffs' characterizations of evidence going to TQL's core function and LAEs' and trainees' primary duties were credited, those roles probably would be ineligible for the administrative exemption. *See id.* at 573-74. But if a jury were to find that the voluminous evidence supported TQL's positions, then that would support the application of the administrative exemption to LAEs and trainees.

At this stage, the Court must draw reasonable inferences in favor of TQL, the non-moving party. *Cervantes*, 914 F.3d at 564. Doing so, it is apparent that TQL has pointed to evidence from which a reasonable jury could find in TQL's favor. Accordingly, the plaintiffs are not entitled to summary judgment.

## Conclusion

For the foregoing reasons, the Court denies the plaintiffs' motion for summary judgment [dkt. no. 187]. The case is set for an in-person status hearing on June 26, 2019 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 14, 2019

11