IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUDGINS, et al., | ) |
| | ) Case No. 1:16-cv-07331 |
| Plaintiffs, | ) |
| | ) Judge Matthew F. Kennelly |
| -v- | ) |
| | ) |
| TOTAL QUALITY LOGISTICS, LLC, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MEMORANDUM ON WHETHER THE COURT
SHOULD BIFURCATE TRIAL ON THE ISSUES OF LIABILITY AND DAMAGES**

I.  **INTRODUCTION**

The Seventh Circuit's decision in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) provides that a plaintiff in an FLSA collective seeking overtime compensation must propose a trial plan demonstrating how the hours that the individual collective members actually worked can be proven on a class-wide basis through "representative evidence" to proceed to trial as a collective on the issue of damages. Here, Plaintiffs have fallen well short of satisfying that burden. To date, they have failed to cite *any evidence* that could possibly show how damages could be established on a class-wide basis, despite having had several opportunities to address the issue. In contrast, TQL has offered significant testimony—almost entirely from the depositions of the collective members themselves—revealing how varied the actual hours worked by the class truly were, and that damages cannot be demonstrated on representative proof. Courts in the Seventh Circuit "frequently" bifurcate trial in such circumstances, where individualized testimony will be required to establish damages for each collective member in the event that liability is found. The Court should do so here as well.

In addition, the Court should order that a second trial on the issue of damages will be presented to a second jury. TQL has a right under the Seventh Amendment and Fed. R. Civ. P. 38 to have any damages determined by a jury. In this case, it would be permissible to have a second jury decide the discrete issue of damages, because there will be no overlap in the factual issues that the first and second juries will be deciding—i.e., the collective members' actual duties performed versus hours worked. Empaneling a second jury would also allow the parties adequate time following the first trial to conduct necessary discovery from the collective members on their damages. Finally, and contrary to Plaintiffs' suggestion, any collective members who chose to

testify to establish their damages must be required to do so in person—and not by videoconference—in accordance with the clear mandate of Fed. R. Civ. P. 43(a).

This trial plan represents the most efficient and effective way of conducting the upcoming trial. It avoids the significant risk of wasted time and resources posed by Plaintiffs' trial plan, which proposes that the parties present evidence of liability and damages at a single trial, with the Court deciding only after-the-fact whether the evidence was truly representative and can be set before the jury. The obvious problem with that approach is that, if the evidence on damages is found not to be representative—and Plaintiffs have done nothing to show that is not the most likely outcome—all of the time and resources spent during trial on damages will have been wasted. In contrast, TQL's plan avoids that risk, preserves both parties' right to a jury trial, allows TQL appropriate discovery on damages (to the extent it is necessary), and complies with Rule 43's general requirement for live, in-person testimony.

## II. OVERVIEW OF THE EVIDENCE ON THE COLLECTIVE MEMBERS' POTENTIAL DAMAGES

### A. The Actual Hours Worked by Individual LAEs and LAETs Widely Varies

The testimony of the 34 opt-in Plaintiffs whom TQL deposed demonstrates that the hours worked by the members of the collective significantly differ.[1] While TQL's set weekday schedule is M-F 7:45am to 5:15pm, LAEs and LAETs typically put in the "hours necessary to get the job done." (Deposition of Jaccob Dean ("Dean Dep."), attached hereto as **Exhibit A**, at 60:15-25.) Whether to come in early or stay late was up to the individual LAE or LAET (Deposition of Shawn Crawford ("Crawford Dep."), attached as **Exhibit B**, at 74:21-75:6, 81:12-24), and TQL's offices

---

[1] In this memorandum, TQL has provided only a portion of the evidence it previously submitted to the Court regarding the differences in the hours worked by the individual members of the collective. Additional evidence of the collective members' deposition testimony regarding the different hours that they worked is available at TQL's Motion to Decertify, Dkt. #182, at pp. 30-34.

2

were open 24/7 for those who wanted to work earlier or later (Deposition of Bryan Tyson ("Tyson Dep."), attached as **Exhibit C**, at 36:8-15). LAEs and LAETs could also work remotely from home. (Deposition of Mohammad Abour ("Abour Dep."), attached as **Exhibit D**, at 41:7-42:7.)

Some LAEs and/or LAETs testified that they rarely worked in the office longer than the base schedule, while others worked significantly more hours. (*See, e.g.*, Deposition of Christopher Flick ("Flick Dep."), attached as **Exhibit E**, at 93:10-94:2 (almost always left at 5:15pm and did almost no work from home); Deposition of Andrew Burks ("Burks Dep."), attached as **Exhibit F**, at 106:9-108:6, 115:22-116:14 (often worked until 7:45pm but left anywhere between 5:15pm and 9pm); Deposition of Mallory Millhouse ("Millhouse Dep."), attached as **Exhibit G**, 95:17-98:13 (typically worked in the office until at least 8:15-9:15pm and sometimes until midnight).) The hours an individual worked could also swing dramatically from one week to the next. (*See, e.g.*, Millhouse Dep. at 142:4-12 (worked within range of 50-70 hours a week); Deposition of Samantha Joseph ("Joseph Dep."), attached as **Exhibit H**, at 53:1-15 (worked from 45-65 hours per week).)

Collective members also differed on whether and to what extent they worked additional hours from home or took lunch breaks. Some testified that they regularly worked significant additional hours from home each week (*see, e.g.*, Deposition of Francisco Perez ("Perez Dep."), attached as **Exhibit I**, at 49:14-50:16 (worked 8 hours per week from home)), while others testified that they never or only very rarely ever worked from home (*see, e.g.*, Flick Dep. at 93:10-94:2). An LAE or LAET who worked on average 8 more hours per week than someone who did not would work 448 more overtime hours per year. Similarly, while some individuals testified that they never took any lunch breaks (*see, e.g.*, Dean Dep. at 63:21-24), others took one-hour lunch breaks every single day (*see, e.g.*, Flick Dep. at 106:7-107:13). An employee who never took

3

lunch would work 5 more hours per week than one who always took one-hour lunches, for a difference of 280 overtime hours over the course of one year.

### B. Representative Conclusions about the Amount of Overtime Worked by Any Individual Collective Member Cannot Be Reasonably Drawn

TQL retained labor economist Paul F. White to review the evidence regarding the hours the collective members claim to have worked to determine whether this information is sufficient to reasonably estimate the hours worked by the individual members of the collective on a representative basis. (*See* Paul F. White Report ("White Rep."), attached as **Exhibit J**.) He concluded that they cannot. To begin with, Dr. White calculated the average estimated total hours claimed to be worked per week by LAEs to be 54.1, with a standard deviation of 6.4, and individual hours ranging from 44 to 70.5 hours per week. (*Id*. at 7.) Based on this distribution, he concluded that the computable hours for 95% of the collective could be expected to fall within a range from 41.6 to 66.7 hours per week. (*Id*.) Because of this wide range—over 25 hours of overtime per week—Dr. White concluded that using a single average as a measure of hours worked is not representative of the testimony of the individual members of the collective. (*Id*.) For example, applying the weekly average to someone such as Adam Lambert, who testified that he worked on average 58.5 hours per week, would shortchange him by 228.8 hours over one year. (*Id*. at 8.) In contrast, applying the average to someone like Christopher Billingslea, who worked on average 44 hours per week, would grant him a windfall of 525.5 overtime hours worked in one year. (*Id*.)

The same is true for LAETs. Dr. White calculated their claimed average hours per week to be 53.3, with a standard deviation of 5.4, and a range of 44.5 to 62.25 hours per week. (*Id*. at 7.) The computable hours for 95% of the collective are thus expected to fall within a range of 42.8 to 63.9 hours per week. (*Id*.) Because the range of overtime hours worked per week is 21.1 for

4

the LAET collective members, Dr. White again concluded that using a single average is not representative of the claimed hours worked by individual LAETs. (*Id.*)

### III. ARGUMENT

#### A. Bifurcation Is Appropriate and Necessary Given the Lack of "Representative" Evidence on the Issue of Damages

##### 1. Under *Espenscheid*, Plaintiffs must present a trial plan that can resolve damages on a class-wide basis.

Fed. R. Civ. P. 42(b) permits the Court to bifurcate trial on the issues of liability and damages. Courts in this district "frequently" bifurcate trial in FLSA actions to avoid the issue of individualized damages. *See, e.g.*, *Magpayo v. Advocate Health & Hosps. Corp.*, No. 16-cv-01176, 2018 U.S. Dist. LEXIS 26282, at *36 (N.D. Ill. Feb. 20, 2018) ("As for individualized damages, courts frequently bifurcate class proceedings to address liability on a class-wide basis and damages individually." (citing *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800-01 (7th Cir. 2013))); *Dailey v. Groupon, Inc.*, No. 11 C 05685, 2014 U.S. Dist. LEXIS 119190, at *32 (N.D. Ill. Aug. 27, 2014) (noting that "bifurcated liability and damages trials" would "alleviate individualized damages issues" in FLSA action).

The Seventh Circuit's decision in *Espenscheid* stands for the proposition that, in an FLSA action, plaintiffs must put forward "representative evidence" before they may proceed as a class on damages without individualized treatment. *See* 705 F.3d at 775 ("With no genuinely representative evidence having been suggested by class counsel, 2341 separate hearings loomed even if the district judge bifurcated the proceedings . . . ."); *see also Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 U.S. Dist. LEXIS 79825, at *18, 21 (N.D. Ill. June 6, 2013) (holding that plaintiffs' failure "to establish the representativeness of their proposed evidence" "preclude[ed] class treatment"); *Tomeo v. W&E Communs., Inc.*, No. 14 C 2431, 2016 U.S. Dist. LEXIS 136689, *54-55 (N.D. Ill. Sep. 30, 2016) (holding that "*Espenscheid* stands for the

5

proposition . . . (1) inferences cannot be drawn from a small, unrepresentative sample of the class as to absent class members' damages, and (2) the plaintiffs must propose a feasible trial plan for proving damages even when the damages vary greatly among class members").

### 2. The evidence demonstrates that damages cannot be determined on a representative basis.

Here, Plaintiffs have not offered any evidence that could satisfy their burden of demonstrating that the collective's damages could be determined through representative proof. After TQL submitted the evidence cited above in its Motion to Decertify regarding the individualized hours worked by the collective members (Dkt. #182 at pp. 30-34), Plaintiffs failed to cite any affirmative evidence that damages could somehow be established on a representative basis. At most, they argued that the minimum schedule for LAEs and LAETs required them to work more than 40 hours in a week. (*See* Plf.'s Resp. in Opp. to Def.'s Mot. to Decertify, Dkt. #197 at pp. 26-27.) But they did not argue that the minimum schedule was, in fact, the number of hours that any members of the collective actually worked. Nor did Plaintiffs rebut or dispute any of the testimony TQL cited about the significant differences in the hours worked—including time in the office, at home, on weekends, and/or on lunch breaks—by the members of the class. That evidence shows that *the claimed number of overtime hours worked per week can vary by as much as 26 hours* from individual to individual. This testimony—taken straight from the collective members themselves—is essentially undisputed by Plaintiffs. Plaintiffs have failed to provide any evidence showing how damages could possibly be proven on a class-wide basis given this testimony. As such, they have not met their burden of showing how damages could be proven on a representative basis.

Instead, Plaintiffs' primary response is simply to attack the reliability of the conclusions reached by TQL's expert labor economist, Dr. White, that the testimony he reviewed from the

deposed collective members varies too widely to be representative of the entire collective. Plaintiffs claim that Dr. White's conclusions are invalid because "he cannot verify whether the data he relied on was the product of random sampling." (*Id*. at p. 31.) This argument misses the point. The deposition testimony in the record was *not* chosen from a random sample and is *not* representative. Dr. White's report explains that, relying on the actual evidence available to the Court, representative conclusions cannot be drawn. Dr. White is not trying to *affirmatively* establish what the collective members' damages are through representative proof, which is Plaintiffs' burden—rather, his report shows that it cannot be done at all. Dr. White's report simply confirms what the testimony evidence that TQL has already cited (and which Plaintiffs have not disputed) demonstrates: that individual damages cannot be determined from class-wide evidence.

Accordingly, the Court should bifurcate trial on the issues of liability and damages pursuant to Fed. R. Civ. P. 42(b). Bifurcation would streamline trial on liability, as well as ensure that damages are correctly and appropriately apportioned in the event liability is found. Without individualized proof of damages, certain collective members would receive a windfall when they worked less than the "average" number of hours for the collective, while others would be undercompensated when they worked above that average. Notably, Plaintiffs previously stated to the Court (in their opposition to TQL's Motion to Decertify) that "[b]ifurcation would also be manageable here where only 142 class members exist," explaining that it would be "fair[] and efficient[]" to have "each LAE/LAET to testify at trial" regarding his or her damages. (*Id*. at pp. 36-37.) That is certainly true here, especially given the relatively modest size of the collective, which further supports bifurcation.

### 3. Plaintiffs' proposed "wait-and-see" trial plan is untenable.

Plaintiffs' proposed trial plan is for the Court to allow full trial on both liability and damages and then—only after the trial has concluded—determine if the evidence presented on

7

damages is truly representative and can be submitted to the jury. This approach would require the parties to present testimony from every opt-in Plaintiff called for trial regarding his or her individual hours worked, as well as rebuttal witnesses from TQL and TQL's expert on damages. In the event the Court determined after trial that damages could not be determined through representative testimony, all of the time and resources already spent would have been rendered entirely irrelevant and wasted. This is especially troubling given that Plaintiffs have had several opportunities before now to present the Court with whatever supposedly "representative" testimony they intend to put on, yet they have wholly failed to do so. It thus appears particularly likely that any time and resources spent on damages at trial will be for naught.

The lone case that Plaintiffs have cited in favor of their proposed trial plan is *Pierce v. Wyndham Vacation Resorts, Inc.*, No. 3:13-CV-641, 2018 U.S. Dist. LEXIS 13866 (E.D. Tenn. Jan. 29, 2018). (Joint Trial Plan, Dkt. #217 at pp. 2-3; Plf.'s Resp. in Opp. to Def.'s Mot. to Decertify, Dkt. #197 at pp. 28-29.) They claim that the *Pierce* court adopted the same approach as they have proposed here, i.e., allowing the plaintiffs to put on evidence of trial and damages at the same time, before the court then decided after-the-fact if the evidence was truly representative on the issues of damages. *Pierce* is inapposite for two reasons:

First, in *Pierce* the issues of liability and damages were both tried to the bench, not a jury. *Id*. at *5. Thus, the Court—as the finder of fact—was ultimately responsible for reaching conclusions on both liability and damages. In that case, it was not inefficient to put on evidence of both liability and damages to the Court and allow it to decide if the proof was representative or not, as the Court was the one ultimately responsible for deciding damages, be it on a class-wide or individual basis. Here, in contrast, TQL is entitled to a jury trial on the issue of damages, and TQL has proposed that trial on damages be heard by a second jury. (*See discussion infra*.) In the event

8

the Court allowed the first jury to hear testimony on damages but later determined that such testimony was not, in fact, representative—or that TQL was not liable to either subclass—all of the time and resources spent would have been rendered entirely irrelevant and wasted. This is especially concerning given that, at the present stage, Plaintiffs have not cited any evidence that could possibly show how damages could actually be determined on a representative basis.

Second, the court in *Pierce* was within the Sixth Circuit and, as it expressly acknowledged, applied a materially different standard to the question of representative evidence of damages than do courts within the Seventh Circuit. As the *Pierce* court explained, *Espenscheid*'s requirement that plaintiffs present "representative testimony" to prove FLSA violations "is at odds with Sixth Circuit precedent," as the Sixth Circuit does not apply *Espenscheid*'s "more stringent" standard. 2018 U.S. Dist. LEXIS 13866, at *229-30. Because the *Pierce* court applied a different standard for allowing supposedly "representative" proof in FLSA actions, its approach is wholly inapplicable here.

### B. Following Bifurcation, TQL Is Entitled to a Jury Trial on the Issue of Damages

#### 1. The Seventh Amendment applies to the determination of damages in FLSA actions.

The Seventh Circuit has recognized that "courts have 'uniformly interpreted' the remedial provisions of the FLSA to provide a right to a jury trial." *Franzen v. Ellis Corp.*, 543 F.3d 420, 425 (7th Cir. 2008) (quoting *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 347 (1998)). It has further held that the right to a jury trial includes the right to have a jury determine a plaintiff's right to damages. *See McKinnon v. Berwyn*, 750 F.2d 1383, 1392 (7th Cir. 1989) ("The Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury.").

Here, assuming liability is established at the first trial, TQL is entitled to have a jury determine any damages it may owe to the collective members at a second trial. Plaintiffs' Complaint specifically requested a jury trial. (Complaint, Dkt. #1.) TQL has not consented to the jury demand's being withdrawn and is, therefore, entitled to a jury trial as well, including on the issue of damages. *See* Fed. R. Civ. P. 38(d); *Middle Tenn. News Co. v. Charnel of Cincinnati*, 250 F.3d 1077, 1083 (7th Cir. 2001) ("Federal Rule of Civil Procedure 38(d) states that once a demand for jury trial has been made, it may not be withdrawn without the consent of both parties.").

The court's decision in *Murillo v. Coryell County Tradesmen, LLC*, No. 15-3641, 2017 U.S. Dist. LEXIS 98067 (E.D. La. June 26, 2017) is instructive here. There, 160 individuals joined an FLSA collective seeking overtime payment. *Id*. at *2. The court bifurcated trial on liability and damages after finding that doing so "would expedite and economize the trial by allowing the jury to first consider the parties' evidence on the liability portion of Plaintiffs' collective FLSA action . . . and, if the jury determines that any or all Defendants are liable to Plaintiffs under FLSA, only then consider the individual evidence of damages for each Plaintiff as to those Defendants found liable." *Id*. at *15. Because the defendants had a Seventh Amendment right to have any damages determined by a jury, the court ordered that "[i]f the jury returns a verdict that any or all Defendants are liable for alleged violations of [the] FLSA, then the second phase of the trial will be immediately tried before the same jury to consider what damages, if any, Plaintiffs are entitled to under [the] FLSA." *Id*. at *22-23. That "second phase of trial would require individualized testimony and evidence by each Plaintiff to prove their damages under [the] FLSA." *Id*. at *18. Likewise here, trial should be bifurcated on the issues of liability and damages, with the issue of damages tried to a jury in accordance with TQL's Seventh Amendment rights.

**2. The issue of damages can and should be tried to a second jury.**

The Seventh Amendment allows separate juries to consider different questions in a single suit so long as those questions are sufficiently "distinct and separate." *See Houseman v. United States Aviation Underwriters*, 171 F.3d 1117, 1126 (7th Cir. 1999). "In other words, the district court must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *Id.* (internal quotation omitted). Accordingly, two juries "can examine overlapping evidence," so long as they do not "decide factual issues that are common to both trials and essential to the outcome." *Id.*

Here, the Seventh Amendment does not preclude the Court from empaneling two separate juries to decide the issues of liability and damages, because there will be little to no factual overlap on these issues, and the juries will certainly not decide any factual issue that is common to both and essential to the outcome. The first jury on liability will hear evidence regarding the actual duties worked by LAEs and LAETs to determine whether the administrative exemption applies. That determination will not require any evidence regarding the actual hours that any claimants actually worked. In contrast, the second jury on damages—to the extent liability is found—would hear evidence regarding the hours that each individual Plaintiff claims to have actually worked to calculate the damages they are owed. The second jury will not have to make any determination regarding whether the administrative exemption applies or what the duties of the collective members actually were.

Proceeding in this manner would have the benefit of allowing the parties adequate time to take additional, needed discovery on the question of individual damages. In the event the first jury finds TQL liable to either the LAET or LAE subclass, separate hearings will be required for each Plaintiff to put on evidence of his or her damages. In that instance, TQL should be permitted a reasonable period of time to conduct depositions of any collective members who have not

previously been deposed and who intend to testify at trial regarding their damages. That discovery would involve, at most, 108 individuals, as 34 of the 142 collective members have already been deposed. Because many collective members worked in the same city, their depositions could be taken relatively quickly, with numerous individuals deposed in a single day and as part of the same trip—precisely as counsel for the parties have previously done in this case. Plaintiffs would likewise have the opportunity to depose any TQL witnesses who will testify regarding the hours worked. Once the depositions on damages have been completed, the parties could then proceed to trial on the question of individual damages for all collective members before a second jury.

### C. Live Testimony from Collective Members Is Required at the Trial on Damages

Plaintiffs have argued that, in the event of bifurcation, Plaintiffs should be permitted to present testimony at the second trial from each of the individual Plaintiffs by videoconference, to avoid the cost or inconvenience of their traveling to Chicago for trial. (Plf.'s Resp. in Opp. to Def.'s Mot. to Decertify, Dkt. #197 at p. 37.) This approach would violate Fed. R. Civ. P. 43(a), which requires that witnesses' testimony at trial "must be taken in open court." The Rule establishes a "presumption that witness testimony shall be taken in open court with the witness being physically present." *Perotti v. Quinones*, 790 F.3d 712, 723 (7th Cir. 2015). As this Court has recognized, deviation from the Rule is only permitted upon demonstration of "good cause in compelling circumstances." *SEC v. Yan*, No. 12 C 2473, 2014 U.S. Dist. LEXIS 42580, at *19-20 (N.D. Ill. Mar. 30, 2014) (Kennelly, J.). Rule 43(a)'s advisory committee notes provide that "[t]ransmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial," and that "good cause and compelling circumstances" most likely arise when a witness cannot attend "for unexpected reasons, such as accident or illness."

Here, Plaintiffs have offered no justification for presenting testimony by videoconference other than the supposed "inconvenience" and cost of their having to travel to Chicago. Such

grounds are plainly insufficient to avoid the requirement that they present their testimony on damages live at trial. *See* Fed. R. Civ. P. 43(a), advisory committee notes. This is especially true given that this is an FLSA collective action, meaning that Plaintiffs have all voluntarily chosen to "opt-in" and join this lawsuit, which they knew was proceeding in Chicago and might ultimately require their live testimony in this location.

### IV. CONCLUSION

For the foregoing reasons, TQL respectfully requests that the Court enter an order establishing a trial plan that does the following:

(a) bifurcates trial on the issues of liability and damages;

(b) in the event TQL is found liable to either the LAE or LAET subclass, grants a second trial on the issue of damages;

    a. permits both parties reasonable time to conduct additional discovery on damages, including deposing any collective members who have previously been deposed;

    b. orders that the second trial be heard in front of a separate jury than that which heard the trial on the issue of liability; and

    c. requires live testimony from all Plaintiffs at the second trial to put on evidence of their damages.

Respectfully submitted,

/s/ Gregory M. Utter
Gregory M. Utter (*admitted pro hac vice*)
Bryce J. Yoder (*admitted pro hac vice*)
Keating Muething & Klekamp, PLL
One E. Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6538

Matthew A. Bills
Barack Ferrazzano Kirschbaum & Nagelberg LLP
200 W. Madison St., Ste. 3900
Chicago, Illinois 60606

Tel: (312) 629-7493

*Attorneys for Defendant Total Quality Logistics*